The PEORIA BRIDGE ASSOCIATION, Appellant, *v.* LYMAN J LOOMIS, Appellee.

#### APPEAL FROM MARSHALL.

Juries may give exemplary damages in cases of willful negligence or malice, if the proof exhibits such a state of case.

To constitute willful negligence, the act done, or omitted, must be the result of intention. Mere neglect cannot ordinarily be ranked as willfulness.

Peoria Bridge Association *v.* Loomis.

The proprietors of a bridge, if it should be applied to the uses of a railroad, should provide increased guards against consequential new dangers.

In actions for negligence, that the plaintiff, if not wholly free from fault, must be as compared to the negligence of the defendants, so much less culpable as to incline the balance in his favor, both being in some fault.

Where there is an absence of proof of willful negligence, and no foundation for the damages awarded, and the finding of the jury manifests feeling and prejudice, the verdict will be set aside.

The rule of damages for personal injuries resulting from the negligence of others, is measured by the loss of time and expense incurred in respect of it; the pain and suffering undergone; permanent injuries sustained; impairing future usefulness, and consequent pecuniary loss.

THIS is an action of trespass on the case, commenced in Tazewell, and, by change of venue, sent to Marshall county, where it was tried at January term, 1858.

The declaration contains two counts, which are as follows:

Lyman J. Loomis, the plaintiff in this suit, complains of the Peoria Bridge Association, a corporation created by and under the laws of the State of Illinois, passed on and since the 26th day of January, A. D. 1847, entitled "An Act to authorize the construction of a bridge across the Illinois river," and also, an Act amendatory thereto, entitled "An Act in addition to an Act entitled 'An Act to authorize the construction of a bridge across the Illinois river,' approved January 26th, 1847," defendants in this suit, of a plea of trespass on the case; for that whereas before and at the time of the committing of the grievances hereinafter next mentioned, the said defendants were the owners and possessors of a certain bridge across the Illinois river, extending from the city and county of Peoria across the Illinois river, in the county of Tazewell, and State aforesaid, and were also the owners and possessors of certain lands adjacent thereto, and lying and adjoining their (the defendants') said bridge, and whereas all and every person was entitled, and of right, to cross and pass over, along and upon said bridge of said defendants aforesaid, on paying tolls therefor to said defendants; and said defendants were bound by law to keep their said bridge in good repair, so as to furnish a safe and convenient passage to all and every person and persons, and their teams, horses, wagons and property, on payment of the tolls aforesaid to said defendants; and said defendants were also bound by law, and of right should and ought to have kept their said lands and premises adjacent to and adjoining said bridge free and clear of and from any and all cars, locomotives, railroad tracks, fixtures, steam engines, and free and clear of and from the running, noise, confusion, whistling and alarm, on, over and upon their said lands and premises so adjoining, adjacent and next contiguous to their said bridge, whereby the horses, teams and property of any and all

persons crossing over, along and upon said bridge of said defendants could become frightened and alarmed, and run or back off, through or over said bridge. Yet the said defendants, not regarding their duty in this behalf, willfully, negligently and carelessly suffered and permitted divers persons, corporations and railroad companies to lay down their certain railroad track on the land and premises of and belonging to said defendants, adjacent to, next adjoining and contiguous to their said bridge aforesaid; and said defendants also authorized, contracted, and agreed to and with, and knowingly suffered said divers persons, corporations and railroad companies to lay down their said road track as aforesaid, and build and construct their fixtures thereon, and run their cars, to wit: one hundred cars and engines, to wit: ten engines and locomotives, to wit: ten locomotives, over and upon said railroad track so laid down and constructed on and over the said premises of defendants as aforesaid, and which said cars, engines, machinery and locomotives were moved, driven and propelled by steam power, with great force, noise, confusion and whistling, to the great fright, consternation, alarm, dread, hazard and danger of all and every person and persons, their horses, teams and property passing and crossing over, upon and along said bridge of said defendants as aforesaid, to wit: on the 15th day of December, A. D. 1856, at the county of Tazewell aforesaid; and by reason whereof, and by reason of the running, driving and propelling of said cars, engines, locomotives and machinery of said divers persons, corporations and railroad companies over and upon the said land and premises of said defendants as aforesaid, with great force, noise, confusion, disturbance and whistling of said locomotives and engines, the team and horses of said plaintiff, so crossing along, upon and over said bridge as aforesaid, as he lawfully might do, and of right was entitled to, took fright, became greatly alarmed, and run and pushed over and through said bridge, and fell, and were precipitated and hurled with great violence to the ground, a great distance, to wit: the distance of fifteen feet, together with the plaintiff, his wagon, team and property, wherewith he the said plaintiff was then and there passing over, upon and along said bridge of said defendants aforesaid; and whereby and by reason of said fall off, through and over said bridge of said defendants aforesaid, the said plaintiff was bruised, injured, wounded and maimed for life, and his bones broken; and whereby, also, his said horses and team were bruised, damaged, injured, wounded and rendered entirely valueless to said plaintiff; and his said wagon and property which said plaintiff was crossing over, along and upon said defendants' bridge, as aforesaid, became broken, injured and worthless, and entirely useless and

valueless to said plaintiff, to wit: at the county aforesaid; and the said plaintiff, in consequence of such falling and being hurled and precipitated to the ground, together with his said horses, team, wagon and property as aforesaid, and in consequence of such bruises, maims, wounds, injuries and broken bones to himself and horses as aforesaid, and the damage and breaking of his wagon, team and property so crossing along, over and upon said bridge of said defendants as aforesaid, and in and about the curing, healing, care, skill and attention of and to himself and horses, and the repairing of his wagon, team and property, was forced and obliged to pay, lay out and expend divers large sums of money, amounting in all to a great sum of money, to wit: the sum of one thousand dollars, to wit: at the county of Tazewell aforesaid.

And also for that whereas, before and at the time of committing of the grievances by said defendants, as hereinafter next mentioned, the said defendants were the owners and possessors of a certain other bridge, extending from the city and county of Peoria, across the Illinois river, into the county of Tazewell and State of Illinois, and over, across and along which said bridge any and all persons were entitled to cross, pass, and of right might cross, pass and travel, and use for the purpose of crossing the said Illinois river, together with their and each of their horses, wagons, teams and property, on payment of toll to said defendants; and said defendants being so possessed of and the owners of said other bridge as aforesaid, and entitled to have, demand and receive tolls from any and all persons so crossing and passing over said other bridge, either with or without their and each of their horses, wagons, teams and property as aforesaid, and by reason whereof the said defendants ought of right, and were bound by law, to repair said bridge and keep the same in good repair, so as to admit of convenient and safe passage for all persons, and their property, teams, wagons and horses, on payment of the tolls to said defendant. Yet the said defendants, not regarding their duty in this behalf, willfully, negligently and carelessly, and by and through their negligence, carelessness and default, and for want of due care and attention in this behalf, suffered and permitted their said other bridge aforesaid to be, remain and continue out of repair, unsafe, and in a rotten, dangerous and hazardous condition, insomuch that the said other bridge did not admit of convenient and safe passage to any and all persons, and their property, on payment of the tolls to said defendants as aforesaid, to wit, at the county aforesaid; and by reason whereof, and by reason of the said other bridge of said defendants being, remaining and

continuing out of repair, and in a dangerous, hazardous and unsafe condition, as aforesaid, to wit, on the day and year aforesaid, at the county aforesaid, the plaintiff, together with his horses, team, wagon, and property wherewith said plaintiff was crossing, passing over and along said other bridge, with due care and skill, as he lawfully might do, were violently hurled, thrown and precipitated down, through and over said bridge to the earth, a great distance, to wit, the distance of fifteen feet, whereby said plaintiff was then and there cut, bruised, maimed for and during his whole life, injured, crushed and wounded, and his bones broken, and remained so for a great length of time, and was thereby hindered and prevented from attending to his necessary and lawful affairs and business during all that time, and is forever maimed and deprived of ability to attend to business, to wit, hitherto ; and the said horses, team, wagon and property which he, the plaintiff, was then and there crossing along, over and across said bridge, as aforesaid, also fell and were hurled, thrown and precipitated through, off of and over said bridge a great distance, to wit, the distance of fifteen feet to the ground beneath said bridge, and whereby the said horses were and became bruised, injured, wounded and maimed, and entirely worthless and valueless to said plaintiff ; and whereby said wagon, team and property were broken, damaged, injured and destroyed, to wit, on the day and year aforesaid, at the county of Tazewell, aforesaid ; and the said plaintiff, in consequence of such falling, bruises, wounds, maims, injuries and broken bones to himself and horses, and the damage and breaking of his said wagon, team and property, so crossing along and over said bridge, and in and about the healing and curing of himself and horses, and repairing of his said wagon, team and property, was forced and obliged to pay, lay out and expend, and actually did lay out and expend, divers large sums of money, amounting in all to a great sum of money, to wit, the sum of one thousand dollars, to wit, at the county of Tazewell, aforesaid. To the damage of the plaintiff ten thousand dollars, and therefore he brings suit, etc.

The defendants filed pleas to the same, as follows :

And the said defendants, for plea to the first count of said plaintiff's declaration, say that they are not guilty in manner and form, as stated in said count of said declaration, and of this they put themselves upon the country, etc.

And for further plea in this behalf to the first count of the plaintiff's declaration, the said defendants say that they did not suffer or permit the said companies, corporations or individuals in said first count of said declaration mentioned, to erect or

construct their said road at the time and place where, etc., in said declaration mentioned, as stated in said declaration, and of this they put themselves upon the country, etc.

Issue to the country.

Upon the trial of this cause, the plaintiff, to maintain the issue on his part, called, as a witness, *David Sloane*, who testified as follows: I know the bridge across the Illinois river at Peoria. I was along at the time his (plaintiff's) horses backed off the bridge and injured them and himself. It was in November, 1856. The bridge was built in 1847. The horses took fright at a locomotive which was on the railroad track of the Peoria and Oquawka Railroad, which was located along the side and near to the bridge, and backed up against the railing, which was thereby broken down, and the horses and wagon of the plaintiff were precipitated to the ground, together with the plaintiff himself, some fifteen feet in distance, by means of which one of the plaintiff's horses was rendered nearly or quite useless, the other one stiffened and lamed, and the plaintiff seriously and dangerously wounded. There was a railing on the bridge at the place, constructed of posts about five inches square, which were attached to the sleepers of the bridge, about one-half of the lower end of the posts being cut away, and then nailed to the sleepers with large nails or spikes. These posts were nine feet apart, and every other one was braced on the outside by a brace, from the top of the post, extending to a cross timber of the bridge, which extended beyond the railing and planks of the bridge. There was a string-piece in the centre of the posts, running from one post to another, two inches by six in size, and another on the top of the posts, about three inches by five, both nailed on. I do not know whether the nails of the posts were pulled out or the posts broken off. I cannot tell how close the horses were to the locomotive; they backed off very quick. The rails on the top were spliced between the posts by being nailed together, and were not strong. Only one of the posts broke when the wagon went over, and one part of the railing, eighteen feet long, went over with the posts. The end posts did not give way. I did not see Loomis, except at a distance, the day of the accident; he was then walking, with the assistance of a man on each side; his head was bloody. I did not see him again for two or three weeks. I do not think he has got over the injuries yet; he sometimes spits corrupted matter. The accident occurred four or five rods from the depot house toward Peoria. My horses were frightened at the same time. I knew the locomotive was there when I first came on the bridge; it was in plain sight. I could see it for a quarter of a mile before I came on to the bridge, but

the locomotive was standing still. We waited to see it move, but it did not move ; we went on. The bridge was safe to pass over if horses were not frightened or scared. Loomis whipped his horses several times after they were scared, and before they went over the bridge. They were ordinarily gentle horses. The locomotive was about forty feet from plaintiff's horses' heads when they backed off. The horses would not have backed off if the railing had been strong enough to have prevented them. I did not consider the bridge safe, principally on account of the weakness of the railing. I did not see Loomis jerk his horses ; I did see him strike them. I was paying particular attention to my own horses, which were also frightened, and was not paying particular attention to the plaintiff. I had long considered the bridge unsafe. There are holes in it ; the railing was insufficient, and many of the posts which held it were loose and rotten. If the railing had been sufficient, the accident would not have happened. Defendants have since built a new bridge, and put on strong railing. The railing that was then on was not as good as ordinary railing on bridges.

*Eri Gray* being sworn, stated : I live in Tazewell county. Know and have often crossed the bridge. I was there on the bridge at the time the accident occurred. Loomis' team passed Sloane's at or near the depot ; that there was a pile of lumber lying on the right hand side of the bridge, and a team of horses unhitched from the wagon. The lumber, team and wagon occupied about one-half the space of the bridge. The engine was about to start as Loomis passed the lumber. His horses' heads were turned towards the engine. They took fright at the engine and backed off the bridge. They had to back not more than eight or ten feet. There was a railing on the bridge, constructed of posts cut into the string pieces, five inches square, with a cross piece two by six inches in the centre, and three by five inches at the top, with a brace at each bent, but none at the centre posts ; cross pieces and braces were all nailed with nails. I don't know whether the posts broke off or the nails pulled out. The posts were nailed—some with three nails, and some with one or two. It is my impression that the nails of the post that gave way were drawn out. The last I saw of Loomis he was standing up in the fore part of his wagon, and he struck his horses once. One horse was badly injured. The other horse was not much injured. Loomis was taken up to Mr. Parker's, injured and in great distress. He has not got over it yet. Loomis' team was about sixty feet from the locomotive track. The track runs near the bridge—forty to forty-five feet off. There is no screen between the two—the railroad and the bridge. There was a timber string-piece on the side of the bridge, on

the top of the plank where the horses backed off the bridge, extending along the edge of the bridge, ten or twelve inches square, and the plaintiff's wagon backed over the said timber string-piece. It was not over three or four seconds from the time the horses were frightened till they went off the bridge. I think said Loomis was so wrapped up in Buffalo skins that he could not have got out of his wagon. The accident was occasioned by the steam of the engine frightening the horses. If the post which held the railing had been sufficient, it would have stopped the horses from going over the bridge. I was close by the plaintiff at the time of the accident. I saw him standing up, whipping his horses, but can't say whether it was with a stick, a whip, or the lines.

*Joseph C. Frye* being sworn, testified as follows: I am a physician and surgeon, and reside at Peoria, Illinois. In November, 1856, I was called on to visit the plaintiff. I found him at Joseph Parker's, in Peoria. He was cold, had great difficulty in breathing, and but little pulse. He had received a severe shock; was very much bruised about the face. His upper jaw was broken on the right side, and he was badly bruised on the hip, breast, forehead and head. He had a severe contusion on the top of his head. His difficulty of breathing and want of pulse continued about forty-eight hours. He was in great pain, and I thought he would die. I consulted with other physicians, and they thought so too. I attended him twenty days, during which time he was unable to go home. He paid me thirty dollars for my fees, etc. His jaw is not yet sound; he discharges corrupted matter from it. I do not think he is, either mentally or physically, the same as he was before he received the injury. His jaw, I think, will not get well, unless a surgical operation is performed on the same.

*Washington Cockle*, also called by plaintiff, testified: I am Secretary of the Peoria Bridge Association. The said Association owned the bridge at the time the Peoria and Oquawka Railroad was built, and it is a toll bridge, and at the time of the accident to the plaintiff, in November, 1856. The witness then, at the request of the plaintiff's counsel, produced the minute book of the Peoria Bridge Association, and the plaintiff offered to read from the same an order under date of October 8, 1853, which is as follows: "On motion of Mr. Curtenius, Ordered that the President and Secretary execute a release of the right of way over the lands of this Association in Tazewell county, to the Peoria and Oquawka Railroad Company, for the purpose of the road of said Company, reserving for the use of this Association the timber upon said land." To this evidence the defendants objected as irrelevant and incompetent. The court admitted

the evidence. Witness further stated that the Peoria and Oquawka Railroad was located before the passage of said resolution, at the place where it is now built, and where the plaintiff's horses took fright, before the above recited order was made, and the Peoria Bridge Association was not consulted at all in relation to this location; they never received any compensation for the right of way, and made no objection to the railroad being located where it is; they claimed the land, and had their bridge on it when the railroad was located.

The plaintiff then offered in evidence an Act of the General Assembly of the State of Illinois, entitled "An Act to authorize the construction of a bridge across the Illinois River," approved January 26th, 1847. Also, "An Act in addition to an Act entitled 'An Act to authorize the construction of a bridge across the Illinois River,'" approved January 26th, 1847; approved June 19th, 1852.

The bridge was built under the authority of said acts, by the defendant.

The plaintiff next called *Joseph Parker*, who stated: I live in Peoria, Loomis came to my house, in November, 1856, badly hurt and wounded. He remained about three weeks. He paid me $20 for taking care of him. I saw the bridge on Monday after the accident, the railing had been broken; there was a board nailed over the railing where it had been broken. I saw the plaintiff's horses and wagon. One of the horses was badly wounded in the shoulder, and is not well yet. The wagon, except the wheels, was pretty much broken up; harness also. The other horse appeared to be lame and stiff. I examined the railing and posts of the bridge; about one-third of them were loose at the bottom; some were rotten, and some I could push off with my hands. I did not consider the bridge safe. The team of the plaintiff was a gentle, ordinarily quiet team, and the plaintiff was a prudent and careful driver, so far as I know. I think the timber on the side of the bridge, on the top of the plank, was about six inches thick and ten inches wide, and was lying on the flat side.

*Henry Price*, called by the plaintiff, stated: I am a veterinary surgeon. I doctored Loomis' horses in November, 1856; one was badly cut in the shoulder, the other lame in the back; one never got well, he was worth $100 before he was injured. Loomis paid me forty dollars for doctoring his horses; it was worth that sum.

Plaintiff next called *Nathaniel Brown*, who stated: I live in Tazewell county, three-fourths of a mile from Loomis'. Loomis drives horses as well as common men. He is a careful and prudent driver, and his horses were as gentle as horses

ordinarily are. Since his accident, he is not able to perform near as much labor as he could before.

Plaintiff then called *Ira Pratt*, who stated: I live in Tazewell county, three-fourths of a mile from plaintiff. I knew his horses, they went well enough,—were gentle. I mended Loomis' wagon after the accident occurred, for which he paid me $20.

Here the plaintiff rested.

The defendant then called *O. Chaunte*, who testified: I live in Peoria, and am a civil engineer by occupation. The railroad, as appears by the books and records of the Peoria and Oquawka Railroad Company, was located in 1851 and 1852. In July, 1854, when I came to Peoria, the tressel work of the road where plaintiff's accident happened, was up. The location of the road at that place is an eligible one, and there is no other proper or eligible location than the one then and now occupied by said road. In order to raise the bluff and to get on to the highlands east, it was necessary for the railroad to keep up Farm Creek; and the road could not cross the river at Peoria at any other place, without great additional expense, and considerable more distance. There was a necessity of crossing the bridge at some place, and the line where the said road is located, crosses at a point where it is less likely to interfere with the travel over it, than at any other place. I was present at the time of the plaintiff's accident, about five hundred feet off. My attention was first attracted by the noise of horses' feet upon the bridge. Same time I saw the engine moving slowly, it moved about four feet; steam was escaping from the cylinder. The horses of plaintiff jumped and backed some. Loomis, the plaintiff, stood up in his wagon and whipped his horses once or twice, then sawed their heads with the lines. They then cramped the wagon round, and backed against the railing of the bridge. The railing snapped, and the hind wheels of the wagon went over, the reach hung poising upon the edge of the bridge about five seconds; the seat slipped back; plaintiff fell down first, then the wagon, then one horse, then the other. There was time for the plaintiff, after the hind wheels were over the bridge, to have got out of the wagon upon the bridge. It was about a minute and a half after the horses took fright, that they went off the bridge. The team being frightened by the locomotive was the cause of the accident. The team was about seventy feet from the engine when the accident occurred. It was fifty-five feet from the outside of the bridge to the railroad track. The posts of the railing of the bridge which I saw, were halved into the sleepers with a dovetail, and the top pieces and the top railing were morticed on;

and the bridge was safe and strong for all ordinary use. The railing was made of upright posts, five inches square, attached to the sleepers, braced on the outside at every other post, with a railing two by six inches in the centre, and three by five inches at the top, and three and a half feet high. I think Loomis, the plaintiff, managed his horses with all the judgment and prudence that a man in his situation would be likely to do. But he sawed their heads while they were backing, and while the wagon was poised upon the bridge, and after the hind wheels had gone over. The top railing at this place was not sound; it was dozy; but outwardly it being weather-beaten, there was nothing to indicate unsoundness. After it was broken, it showed that it was partially decayed. But one of the posts were broken off at the time of the accident. There was no brace to this post; but thère were braces to the two on each side, nine feet distant from this one; neither of which were broken or thrown off. The braces were at each bent, when the timbers projected beyond the planks of the bridge. The string-piece, or timber on the edge of the plank where the horses backed the wagon off, was twelve inches square, and the wagon was backed over the timber.

*George·Rodgers,* called by defendant, testified : I am a carpenter and bridge-builder, and have been so for more than seven years. I saw the plaintiff's wagon going over the bridge at the time of the accident. I was about twenty feet from the bridge, on the lower side. The wagon, team and plaintiff came off that side. I considered the bridge a safe bridge for the passage of teams. The railing is as good as is generally put on bridges. When I first saw the wagon of plaintiff, it was nearly against the railing. Plaintiff was standing up. From the time I first saw it in this position, five or six seconds of time elapsed before it went off the bridge. Plaintiff was pulling on the lines. The wagon was poised on the bridge, after the hind wheels were over, four or five seconds. I think the plaintiff might have jumped out on the bridge. I think he was pulling the horses; don't remember of his striking them. None of the posts were broken. The railing appeared sound on the outside, but upon examination, on the inside it had commenced decaying. I built two bridges within the past year, and put upon them the same kind of railing as was on this bridge.

Defendants then called *Henry Maxwell,* who testified : I saw the accident. I was standing at the engine. The hind wheels of the wagon, when I first noticed it, were against the railing of the bridge, and Loomis, the plaintiff, was pulling back on the lines, and when the hind wheels hit the railing, it snapped,

and over they went. The wagon, after the hind wheels were over, stopped five or six seconds on the bridge, before it finally went over. I was about two hundred feet off at the time. The engine was hauling up iron and tin. The plaintiff's horses took fright at the engine. There were timbers lying along the top of the bridge, on the planks, on both sides. The bridge was safe for all ordinary travel. Large loads and teams were daily in the habit of crossing it.

*Hiram Bunn*, called by defendant, testified : I was standing on the bridge, thirty or forty feet from the plaintiff's team, at the time the accident occurred. The team was frightened at the engine, and backed off the bridge. Plaintiff was jerking his horses and slapping them with the lines. It was a minute or over, after the horses were frightened, before they backed off. The bridge was safe if teams were not frightened. Other teams passed over safely. Loomis had time to get out of his wagon, after the horses were frightened, before the wagon was backed off the bridge. I have often seen men with teams, when an engine was passing, get out and hold their horses by the heads ; I have seen a great many do so. I think Loomis had time to jump from his wagon on to the bridge, after the hind wheels were over the edge of the bridge ; I said at the time, he was foolish for not doing so. I saw him pulling on the lines before the wagon struck the railing.

The defendant then read in evidence an Act of the General Assembly, entitled, " An Act to incorporate the Peoria and Oquawka Railroad Company," approved February 12, 1849; and also, an Act entitled, " An Act to amend an Act entitled ' An Act to incorporate the Peoria and Oquawka Railrad Company, approved February 12, 1849,' " approved February 10, 1851. And also an Act entitled, " An Act to amend an Act entitled ' An Act to amend an Act entitled an Act to incorporate the Peoria and Oquawka Railroad Company, approved February 10, 1851,' " approved June 22, 1852.

The plaintiff objected to the admission of this evidence, but the court overruled the objection and admitted the same. This was all the evidence.

The court, at the request of the plaintiff's counsel, instructed the jury as follows :

1. The defendants were bound in law to keep their bridge in good repair, so as to admit of the *convenient* and *safe* passage of all persons with their property, and if the jury believe from the evidence that the bridge was not in such repair as to render the passage thereof *safe* at the time the injury happened to the plaintiff, the defendants are liable for such injury if it was

occasioned by the bridge so being unsafe, if the plaintiff used reasonable care.

2. The defendants were bound to keep their bridge in such repair as to render it reasonably safe from the consequences of *such accidents* as might be justly expected to occasionally occur thereon ; and if the jury believe from the evidence that the want of such repair co-operated to produce the injury in this case, the defendants are liable, if plaintiff used reasonable care.

3. The defendants were bound to keep their bridge in such repair as to render it safe against such accidents as might reasonably be supposed to occur, and if the jury find in this case that the bridge was not safe so as to protect the plaintiff from such injury, the defendants are liable if plaintiff used reasonable care.

4. It is not sufficient that the bridge was safe for *gentle horses;* it must be so built and kept in repair as to reasonably protect persons from injury whose horses are not gentle and well trained, and so as to guard against such accidents as may be reasonably expected to occur.

5. If the jury believe from the evidence that the injury would not have happened if the bridge had been in suitable repair, and sufficiently strong to reasonably prevent the wagon from going over, then the defendants are liable if plaintiff used reasonable care.

6. The charter of the Peoria and Oquawka Railroad did not repeal that part of the bridge charter which requires them to keep their bridge in repair so as to render its passage safe ; and they were bound in law to keep it in such condition as to admit of its *safe* passage at the time of the accident complained of in this cause.

7. The defendants had no right to place any obstruction on or near their bridge which would render its passage perilous or unsafe ; nor had they a right to authorize or permit any one else to do so ; and if they have done so, they are liable if such obstruction caused the injury complained of, if the plaintiff used reasonable care.

8. If the defendants authorized the Peoria and Oquawka Railroad Company to build their road and run their engines thereon contiguous to the defendants' bridge, and on the defendants' land, and the running of such engines frightened the horses of the plaintiff, and caused the injury complained of, the defendants are liable, if the plaintiff used reasonable care.

9. Persons in positions of great peril are not required to exercise all the presence of mind and care of a prudent, careful man ; the law makes allowance for them, and leaves the circumstances of their conduct to the jury.

10. The jury may give such damages in this case, if they find for the plaintiff, as will fully compensate him for all the injuries he may have sustained by reason of the accident, including any moneys expended by him in curing himself and horses and repairing his wagon, the diminished value of his horse, and the injury occasioned to his person and intellect, and for his sufferings, pain, danger to his life and loss of time in consequence thereof.

11. If the jury believe that the defendants were guilty of criminal and gross negligence in not keeping their bridge in repair, then the jury may give exemplary damages, if they find for the plaintiff.

To the giving of which said instructions the defendants, by their counsel, then and there objected, and excepted to the opinion of the court in giving the same.

The counsel for the defendants then requested the court to instruct the jury as follows:

1. That the law and the charter of the Peoria and Oquawka Railroad Company authorized said company to construct their railroad upon the most eligible route from Peoria to the Indiana State line, and that the question of eligibility in relation to the route was a question to be decided and determined alone by said company; and that if they had located and established their road at the place where the grievances complained of in the declaration occurred, as stated in the declaration, the plaintiff, as against the defendants, had no right to complain of said location.

2. That as far as the plaintiff is concerned, it is wholly immaterial whether the defendants donated the land to the Peoria and Oquawka Railroad Company, or whether they gave said company the right of way for an agreed price, or their damages were assessed as provided by law.

3. That if the Peoria and Oquawka Railroad Company had, pursuant to law, located and constructed their road over the land of the defendants, at the place where the alleged grievances in the plaintiff's declaration are supposed to have occurred, prior to the time of the happening of the same, and the injury to the plaintiff was occasioned by his horses being frightened by the noise of the cars, or the noise or whistling of a locomotive upon said railroad, the defendants are not liable in this action.

4. [That the owners of a toll bridge are not liable as common carriers; that they are not insurers of property passing over the same,] and are only bound to use reasonable care and diligence to keep their bridge in good repair, so that ordinarily gentle teams may pass in safety over the same, and that they are not responsible for any injury arising from horses taking

fright at a railroad, or engine running upon the same, when said road has been constructed under the authority of law, or under a charter from the General Assembly of this State.

5. That the owners of a toll bridge are only bound to keep their bridge within its own limits in good repair, so as to afford a safe passage to ordinarily quiet teams, and to prudent and careful drivers ; and that they are not responsible for any accident or injury which may occur by reason of any railroad, structure or other thing existing, set up or operated outside of the limits of such bridge, and which had been placed, or set up or operated there under the authority of any law of this State.

6. If the jury believe that the plaintiff himself was grossly careless and negligent, and had sufficient opportunity to prevent the injury by leaving his wagon and holding his horses by the head while the engine was passing, and that he neglected to do so, and thereby the injury was occasioned, the plaintiff cannot recover.

7. That the owners of a bridge are not bound in law to construct any railing along the sides of the said bridge, to prevent frightened horses from running or backing off the same.

8. That if the jury believe, from the evidence, that the plaintiff knew or might have known that his horses were accustomed to become frightened at a locomotive, and if they further believe that the locomotive which frightened his horses was in plain sight for at least half a mile before he approached the same, and that as he approached, he or any other person of ordinary understanding and prudence could plainly perceive that said locomotive had her steam up and was ready to start, then the plaintiff would be guilty of gross carelessness and negligence if he drove his team up to within a few feet of said locomotive, and if they believe that the horses became frightened at such locomotive, and the accident occurred in consequence thereof, under such circumstances the plaintiff cannot recover.

9. That if the jury shall believe, from the evidence, that the railing of the bridge was not sound and sufficient, still it would not excuse the plaintiff from using reasonable care and diligence to avoid the accident; and if the jury shall believe, from the evidence, that the plaintiff did not use such reasonable care and diligence, they will find a verdict of not guilty.

10. That if the jury believe, from the evidence, that the injury done to the plaintiff and his property was the result of the fault or negligence of the plaintiff, or the fault or negligence of both the plaintiff and defendant, without any intentional wrong on the part of the defendant, then the plaintiff cannot recover, and the jury must find for the defendant.

17

11. That the burden of proof lies upon the plaintiff, not only to prove that he himself used reasonable care to avoid the injury, but that the bridge was not sufficient to allow the plaintiff to pass over safely.

12. That notwithstanding the jury may believe, from the evidence, that the defendant may have been in the wrong in giving the right of way to the Peoria and Oquawka Railroad Company, still, if the jury shall believe, from the evidence, that the plaintiff might, by using reasonable care and diligence, have avoided the accident, he was bound to use reasonable care and diligence; and if the jury believe, from the evidence, he did not do so, they will find a verdict for the defendant.

13. That if the jury believe, from the evidence in this case, that the plaintiff is entitled to recover at all, he can only recover such damages as he has proved that he actually sustained; and that no vindictive or exemplary damages can be allowed, unless it is shown that the injury (if any) to himself and property was occasioned by some malicious act or acts of the defendants.

The court gave the instructions numbered 9, 10, 11, 12 and 13, and refused to give all the others, numbered 1, 2, 3, 4, 5, 6, 7, and 8, except so much of number 4 which reads as follows: "That the owners of a toll-bridge are not liable as common carriers. That they are not insurers of property passing over the same."

To the decision of the court, in refusing to give all said instructions asked, the defendants excepted.

The jury returned a verdict for the plaintiff, for the sum of $5,750.

The defendants' counsel entered a motion for a new trial, for the following reasons:

1. The verdict is against law and evidence.

2. The damages are excessive.

3. The court gave improper instructions to the jury at the request of the plaintiff.

4. The court refused proper instructions asked by the defendants.

5. The court admitted improper evidence offered by the plaintiff.

The court overruled said motion.

The cause was heard before BALLOU, Judge, and a jury.

N. H. PURPLE, for Appellant.

MEAD & WILLIAMSON, for Appellee.

BREESE, J.    There can be no doubt, as urged by the counsel for the appellee, that juries may give exemplary or punitive damages, in cases of willful negligence or malice.    But it is requisite such a case must be made.

We look in vain into the evidence of this cause for the proof of any willful negligence on the part of the Bridge Association. Some of the witnesses say, the bridge was unsafe before and at the time of the accident, whilst others, equally credible, give a contrary opinion.    That the appellants were negligent in not providing additional precautions against the increased dangers occasioned by the construction of the railroad, and its operation by noisy machinery, may be true, but it is not of that degree denominated willful.    To constitute willful negligence, the act done, or omitted to be done, must be intended.    Mere neglect to keep a bridge in repair, cannot, ordinarily, be alleged to be willful; and we see no facts in this case to encourage such an idea.

It is of but little importance, whether the bridge company permitted the railroad company the use of their bridge, or that it had been condemned for such use; the obligation pressed alike upon the bridge company to provide increased guards against new dangers.    This they did not do, but it is very doubtful if the injury to the defendant was wholly caused from this neglect.

The proof shows, that the want of care of the plaintiff contributed very essentially to produce the accident.    He saw and heard the locomotive; he had time and opportunity to get down and take his horses by the head, as prudent men do every day even when plowing in their fields, on the approach of a locomotive.    It is required of them, that they shall put themselves to some little trouble to avoid these accidents.    Even when the wagon was pushed on the railing, some of the witnesses say, he had time to get out and save himself.    He did not attempt to do anything, but sat in his wagon, wrapped in his buffalo-skin, whipping his horses, sawing their mouths with the reins and bits, and so carelessly and unskillfully managing them as to have contributed very materially to produce the disaster.

We have said, repeatedly, in such actions for negligence, that the plaintiff, if not wholly free from fault, must be, as compared to the negligence of the defendant, so much less culpable as to incline the balance in his favor, both being in some fault.

It is true, the jury, by their finding, have ignored any negligence on the part of the plaintiff, and found willful negligence against the defendants.    We do not think the testimony sustains them in such finding; that it is vastly the other way, and, taken

in connection with the damages assessed, $5,750, manifests feeling and prejudice.

Our statute, L. 1853, p. 97, which is a copy of 9 and 10 Victoria, ch. 93, in case death ensues from such negligent acts, allows no more than five thousand dollars damages, however willful or malicious the act may be.

With what propriety the jury, in this case, for an injury, great, to be sure, but not endangering life, could find this verdict, if not influenced by prejudice, we do not well understand.

We think there is an absence of proof of willful negligence, and no foundation established for the damages awarded.

The tenth instruction was too broad, and must have had great weight with the jury in finding these damages. A man's life may be in danger, and he receive no injury. The rule of damages, for personal injury inflicted by negligence, is loss of time during the cure, and expense incurred in respect of it, the pain and suffering undergone by plaintiff, and any permanent injury, especially when it causes a disability from future exertion, and consequent pecuniary loss. The judgment is reversed, and the cause remanded.

*Judgment reversed.*

Chief Justice CATON did not hear the argument, and gave no opinion.