Chicago, Burlington and Quincy Railroad Co. *v.* Hazzard.

---

THE CHICAGO, BURLINGTON AND QUINCY RAILROAD COMPANY, Appellant, *v.* ERASTUS W. HAZZARD, Appellee.

APPEAL FROM KNOX.

In a declaration in case against a corporation for injuries sustained, the declaration should allege that the defendant was guilty of negligence, and that the plaintiff exercised proper care; and the proof should support the allegations.

It is not negligence in an engineer of a train on arriving at a station, if he should let on more than the exact quantity of steam necessary to overcome the friction of frogs and switches, thereby creating a jerking motion of the train, if in so doing he exercises a reasonable discretion.

It is not usual to place a chain across the back end of the platform of a caboose car, and the omission to do so is not negligence. A passenger taking a freight train, takes it with the increased risks, or diminutions of comfort incident thereto, and if it is managed with the care requisite for such trains, it is all that those who embark on it have a right to demand.

Information by a conductor of a freight train to a passenger of mature age and accustomed to railroad traveling, that persons sometimes debarked at a particular place, does not require the passenger to take the risk of leaving the car at such place, and is not negligence in the conductor.

The care and diligence to be used by both parties, are to be measured by the known perils to which passengers are exposed by the particular kind of conveyance used. BREESE, J.

The Supreme Court will examine the whole record, the facts as well as the law, and reverse or affirm a case as justice shall require, although a jury may have passed upon it. A jury should not show by verdict the appearance of being governed by passion, prejudice or unworthy motives.

Where a party receives an injury to which his own negligence has contributed, he cannot recover.

THE facts of this case are stated in the opinion of Mr. Justice BREESE.

WALKER, VAN ARMAN & DEXTER, for Appellant.

J. MANNING, and E. VAN BUREN, for Appellee.

BREESE, J. This is an action on the case brought by the plaintiff, a member of the bar of this court, against the Chicago, Burlington and Quincy Railroad Company. There are four counts in the declaration. In the first it is averred, in substance, that at the time of the alleged injury, the defendant was a body corporate, and was the owner and proprietor of a railroad extending through and from Kewanee, in said

State, to Galesburg, in said county, with trains of cars running thereon for the conveyance of goods and passengers. That on the 29th June, 1860, the plaintiff, at Kewanee, became a passenger on defendant's said cars, to be safely carried thereon from Kewanee to Galesburg, for the sum of one dollar, then and there paid to the defendant.

That the defendant then and there received the plaintiff as such passenger, and it thereupon became the duty of the defendant safely to carry the plaintiff from Kewanee to Galesburg, and that there its train should be reasonably stopped and slackened in its speed, to enable the plaintiff to alight without injury to his person.

But that the defendant did not use due care that the train should be so stopped and slackened in its speed at Galesburg, so that the plaintiff should be safely discharged from and permitted to leave said cars, but neglected to do so, and after the arrival of said train at Galesburg, and whilst the plaintiff, with the consent and permission of the defendant, was alighting from said train, caused the same to be suddenly and violently started and moved, by means whereof the plaintiff was violently thrown to the ground, and his ankle dislocated, and right leg fractured, and plaintiff otherwise injured, etc.

The second count is like the first, except that the duty, and violation thereof, is alleged as follows:

" And thereupon it became the duty of the defendant to use due and proper care that the plaintiff be safely carried from Kewanee to Galesburg, and there be safely discharged and released from said train of cars. But the defendant so carelessly, negligently and unskillfully run, managed and conducted said train of cars, that while the plaintiff was such passenger on said train, he was, by the carelessness and negligence of the defendant, violently thrown upon the ground, by means whereof the legs, feet and ankles of the plaintiff were fractured, dislocated and broken," etc.

In the third count, the duty of defendant, and breach thereof, after having set forth that on the day and year aforesaid, the plaintiff had become a passenger on the cars of the defendant from Kewanee to Galesburg, is alleged as follows:

"And thereupon it became the duty of the defendant to provide safe and suitable cars, with railings, guards and protections upon and around the platforms of said cars, so that passengers thereon could safely and securely go out upon said platforms in getting from the said cars, and to use due care that the said plaintiff be safely carried upon said cars from Kewanee to Galesburg, and there be safely discharged and delivered therefrom.

That the defendant did not provide cars for passengers in said train with suitable railings, guards and protections around the platforms thereof, so that passengers upon said train could safely go out upon said platform in getting off the said cars; and did not use proper care that the plaintiff be so carried and delivered, as aforesaid, at Galesburg.

But the passenger car used in said train, on which the plaintiff was carried, was without any such suitable railings, guards or protections upon or around the platforms thereof; and the defendant so carelessly managed the train while he, the plaintiff, was a passenger thereon, and while he was being discharged and getting therefrom, at Galesburg, that by reason of the passenger car in said train, upon which he was carried, not being provided with suitable railings, guards or protections upon or around the platforms thereof, as aforesaid, and by reason of the carelessness and negligence of the defendant in the management of said train of cars, whilst the plaintiff was getting off the same at Galesburg, was violently thrown from said cars upon the ground, and his foot and ankle thereby fractured and dislocated," etc.

In the fourth count, the plaintiff, after setting forth that defendant was a common carrier, and that he took passage on its cars, etc., substantially, as in the first count, alleges, that it thereupon became the duty of the defendant to provide safe and suitable cars, with railings, guards and protections upon and around the platforms of said cars, so that passengers could safely go out upon said platforms in getting off said cars.

And to use due care that the plaintiff should be safely conveyed on said train from Kewanee to Galesburg, and at the station house of defendant at Galesburg, that being the proper and usual place of discharging and delivering passengers, should be safely discharged from said train of cars.

That the defendant did not have cars for the carriage of passengers in said train with suitable railings, guards and protections around the platforms thereof, so that passengers could go upon the platforms safely in getting off said cars.

That it did not use due diligence that the plaintiff should be so carried on said train, and at said station house delivered therefrom.

But that the car used in said train, and on which the plaintiff was carried, was without suitable railings around the platforms thereof.

That defendant undertook improperly to discharge the plaintiff from said train before it had arrived at the station house of the defendant at Galesburg, and while the cars were in motion, at an improper time and "place, and so carelessly managed the

train, that whilst the plaintiff was being discharged therefrom, by reason of the car not being provided with suitable guards, railings and protections around the platforms thereof, and by reason of the defendant undertaking to discharge the plaintiff therefrom while it was in motion, and before it had arrived at the station house, and by reason of the careless management of said train while the plaintiff was getting off the same, he, the said plaintiff, was violently thrown through the doorway, and over the platform of said car, and on to the track of said road, and thereby his right foot and ankle were dislocated," etc.

To this declaration, the defendant filed the plea of not guilty, upon which issue was joined, the trial of which was had in said court before a jury, on the 28th of February, 1861.

There is no point made here, or in the court below, of the sufficiency of the declaration. The rule being, that the plaintiff, in cases like this, must allege and show affirmatively, that the defendants were guilty of negligence, and also, that he himself exercised proper care, it would seem, on the principles of correct pleading, that his exercise of proper care, as well as the negligence of the defendant, should be alleged in the declaration. If both must be proved, both must be alleged. In this respect, then, the declaration was bad, for there is no averment in it, that the plaintiff exercised proper care. The books are full of cases, where, in such actions as this, the burden of proof is always held to be on the plaintiff, that he was himself exercising ordinary care and diligence at the time the accident happened. *Butterfield* v. *Forester*, 11 East, 60, is a leading case on that point. *Galena and Chicago Union R. R. Co.* v. *Fay*, 16 Ill. 569.

But passing from the declaration, the jury have found, on all the counts, in favor of the plaintiff, and ignored all pretense of a corresponding or greater degree, or any degree, of negligence on his part, and we are to inquire if they have found according to the law and the evidence. And here this court is met by the acknowledged doctrine, that the jury having found their verdict, it ought not to be disturbed, unless it appears that they have so mistaken or misapprehended the facts, as to compel the inference that they have been actuated by prejudice or partiality in the finding—that they have found palpably and manifestly against the evidence. As a general rule, it is undoubtedly true, that courts will not, and ought not, to set aside a verdict, because the jury have found against the weight of evidence, unless palpably so, or on insufficient evidence, or for a misdirection of the court on questions of law, or a disregard of the instructions of the court as to the law; but this is with the well understood

proviso, that the court shall, notwithstanding, be satisfied on the whole record, that substantial justice has been done.

As to the question of negligence: it consisted, on the theory of the plaintiff below, first, in causing a jerking of the train at the particular time and place when and where the accident happened; second, in not having up a sufficient guard or chain at the rear end of the rear car to prevent passengers from being thrown off, or over the platform of the car; third, in the conductor of the train failing to caution the plaintiff, he knowing that the plaintiff was about to get off, and apprising him of the danger to which he was about to expose himself, and failing to render him such assistance as would have protected him from danger. In these consist the negligence charged. We do not propose to go into the whole evidence, and repeat it here, as it is very voluminous, but state only the impression it has made upon us, after a careful study of it. As to the necessity of jerking the train at the particular time and place: the practice with all trains seems to be, that on approaching a station, for the purpose of slackening the speed, the driver, at an appointed place, shuts off the steam, and from that place the train is allowed to run by its own momentum, and if that is not great enough for the purpose of moving it to its destined place, of which the driver is to judge, he lets on steam sufficient for the purpose. With steam as the propelling power, by shutting it off, and suffering the train to move by its own momentum, relieves it of the strain on the connecting bars, and closes it up to the engine; and increasing the momentum, by letting on steam, these bars are drawn out, or the slack, as it is called, taken up with a jerk of more or less violence.

Three witnesses on the part of the plaintiff, who were, or had been, connected with railroads, one of whom only was an engine driver, testify that, in their judgment, it was not necessary to let on steam at that particular time and place, the train having sufficient momentum, moving at the rate of three miles an hour, to carry it to its place of destination. Other witnesses, with equal or superior advantages of knowing the facts, greatly exceeding in number those of the plaintiff, give it as their opinion, that such a train as that—a heavy freight train made up of fifteen or twenty cars—running three miles an hour at South street, the place where the accident happened, could not run on to the scales, the usual stopping-place, a distance of five hundred feet, by its own momentum; and the reason is, as shown by the diagram and by the witnesses, that several frogs and switches had to be passed, impeding, necessarily, by increased friction, the motion of a heavy train. To overcome this, it was the driver's business and duty to let on sufficient steam. The exact

25

quantity to be put on can never, in any case, by the most skillful and attentive driver, be exactly calculated, but he will always, if he performs his duty, let on enough. We think it was clearly shown, that on the arrival of the train at South street, under its own momentum, it could not reach the scales, without letting on steam, and we hold that it is not negligence, if more than the exact and precise quantity, when carefully guaged, and really necessary to overcome the increased friction at the frogs and switches, was let on by the driver. It is not to be expected that the quantity can be accurately guaged to a pound or ounce. If only steam enough be let on to start, or increase the speed of one car at a time, the whole power of the engine would be lost, and the speed of the train would not be accelerated. A judicious and skillful driver will always let on steam enough to accomplish the whole object, and if he should happen to let on a few pounds more than precisely enough, he cannot be charged, in so doing, with negligence, want of skill, or improper management. No driver can be found who could, in a moment, make the exact calculation, and railroad companies must use the men they can find, with the imperfections attaching to the best of them. But the plaintiff insists, that if it was necessary to let on steam, still it was not necessary, in so doing, to jerk the train, so as to throw him off or over the platform.

On this point, the same three witnesses produced by the plaintiff, testify, that with proper skill and caution, the driver can so let on steam, as to move the train without much, if any jerk, if his engine is in good order.

Thirteen witnesses on the other side, equally competent and reliable, all concur in saying that freight trains are all liable to these jerks, and that they cannot be prevented when steam is put on, even if the engine is in good order. When running slowly, the speed having been suddenly slackened, the train has closed up on the engine, and in drawing it out again, by letting on steam, there must be a jerk. It needs no witnesses to prove this: it is palpable to the most careless observer. The longer the train is, the more violent must be the jerk, and the rear car will feel it the most, and in such a train as this was, a person, incautiously standing at the door of the rear car with one leg extended to get on the platform, would be disturbed in his balance, and lose his erect position, with the chances greatly in his favor of falling out. It is unimportant how many witnesses may swear, that an engine driver, of competent skill, can always regulate the exact amount of steam to let on. He may put on just as little or just as much steam as he pleases, if he has perfect control of the throttle valve, but how much, or how little he shall put on, at a particular time, cannot be precisely estimat-

ed, even with such control of the valve. His duty is, to put on enough. Jerking then is inevitable. Some of these witnesses, it appears, were employees of the defendant, and that fact has given occasion for an onslaught upon their veracity and integrity, which, in proportion to its violence, has not failed in its effect upon the jury. Why they should be discredited, to any greater extent than the agents and employees of individuals, is incomprehensible, except upon the supposition, that railroad companies are not in favor with the public, and every man connected with them, no matter how high his character may be in society, among those who know him best, is stigmatized by his employment, and his veracity impeachable, from that circumstance alone.

That this jerking was inevitable, we think is abundantly proved, and not ascribable to negligence, want of skill or improper management of any agent or employee of the defendants.

If it be true, as represented by the defendants' witnesses, that a sudden jerk will throw an unguarded man off his feet, the plaintiff insists, it is a mystery why the brakemen, who operate their brakes on the top of the car, are not frequently thrown off, and killed. There is no evidence as to such casualties, attending such brakemen, but we can well understand why they should not fall off, as they have the wheel of the brake to hold on to. Their situation, therefore, would be thought to be, comparatively, a safe one.

Pursuing further the question of negligence, the plaintiff contends, that a guard chain extending from railing to railing, across the open space through which he fell, would have prevented his fall, and if so, the absence of such chain was negligence on the part of the defendant.

There is much testimony to this point. Some five witnesses for the plaintiff stated, that such chains have been, and are now used, on several roads, at the rear end of the rear car on passenger trains—such cars as are designed for passengers, and that in their opinion, they are a necessary safeguard for the protection of passengers, and in case of a sudden jerk, such chains would, quite likely, save a man from falling off the platform. Two of these witnesses gave evidence of being themselves saved by such a chain, and one of them had seen a woman with a child in her arms saved by it, where there was a sudden jerk of the train.

More than a dozen witnesses for the defense, equally intelligent, skillful and reputable, gave their testimony, that such chains had been used, at one time, on most passenger cars, but for the last three or four years, had been generally discarded, especially throughout the West, as of no use, affording but little if any protection to passengers, and as greatly incommoding

both passengers, conductors and brakemen. This is testimony in regard to passenger cars, strictly so. All the witnesses concur in saying that on freight cars, or caboose cars, such as the plaintiff occupied, no chain was ever used by any company. Among the millions of passengers by railroad, if it does appear that two or three persons have been saved from falling off the platform by a guard chain, does that prove it would be negligence in a company that did not provide them? A railroad company cannot ,provide, nor is it their duty to provide every possible and conceivable safeguard for their passengers. If it was their duty, a passenger could not go from one train to another for any purpose, and be entirely safe, without the attendance of a strong man to protect him against every conceivable accident. This would be more efficacious and protective than a chain guard, yet who will contend it is negligence in not providing such an escort?

But this testimony, in respect to the chain guard as a preventive of possible dangers, has reference entirely to passenger cars, strictly so called. On them they are not generally used, and of no benefit sufficient to overcome the inconvenience attending them. On a freight car, or a caboose car, in which passengers may ride if they choose, a guard chain is never used. It is in proof, this train was the regular freight train, having no passenger car attached, but " a caboose " designed for the use of the hands and other employees on the road. It is a convenience, on roads whose business will not allow them to run more than one daily passenger train, and it is known to the public, as an inferior mode of conveyance in all respects, to the regular and neatly fitted passenger car. The train to which this " caboose " was attached was a regular freight train, and nothing else, and for the carriage of freight—the carriage of passengers was an incident, and not the principal business of the train. But so far as the question of negligence in the conduct of the employees on the train are concerned, we should hold, they were bound to exercise the same diligence and care, as on a regular passenger train. It was the practice to permit passengers to ride in it, for which the usual passenger fare was demanded, so that it is not for the defendant to deny his liability as a carrier of passengers, but it by no means follows that the defendant was bound to have the caboose as safe and convenient as a car intended only for the carriage of passengers. The caboose is seen by the traveling public—it is made for the company's use chiefly—is known to be deficient in very many qualities, which distinguish the passenger car. One great safeguard, found on all passenger trains, to be without which, would be great negligence, is the bell cord, by which the conductor has com-

plete control of the driver, and through him, of the train, by means of well understood signals communicated by it. This cannot well be put upon a freight train, and is never found there, and from this circumstance alone, a seat in the caboose attached to it is more dangerous, than in a passenger car of a passenger train. Can it be said it is negligence in not having a bell cord to a freight train on which, for the accommodation of a person, he is permitted to ride? The public are not invited to occupy the caboose; they are permitted to do so if the urgency of business, or other motives, forbids delaying to wait for the regular passenger train. The passenger takes the car as he finds it, and must put up with all its deficiencies and inconveniences, and want of safeguards; the company being responsible only for the care and vigilance, and skill and proper management of those having it in charge, such as it is, and that it is not defective in any essential particulars. The plaintiff knew all about this car when he got into it—he took it in preference to waiting for the passenger train. It was as safe, and as well fitted as a caboose usually is. The only obligation, then, upon the defendant, was to carry the plaintiff safely in the caboose as it was. He took it as it was—it was known to him to be a freight train, with freight train accommodations only, and he could have refused to go in it. It was not the usual way in which gentlemen in his position, traveled—a few hours delay would have given him a better mode. Taking this, he took it well knowing what he did, and well knowing it was an inferior mode of conveyance, and impliedly agreed to accept and be satisfied with such accommodations as that particular car afforded. Nobody is deceived by it. It is not held forth as a passenger car, but as an inferior car, which persons may ride in if they choose, and be content with the accommodation it offers. At the same time, the employees are held to as strict accountability in the management of a train with a caboose attached, as the law imposes in the transportation of passengers in cars specially provided for such purpose. A chain guard is not appurtenant to such a car—is never found upon one, and it was no negligence in not providing one for this particular car. We have said in 16 Ill. 568, (*Chicago & Galena U. R. R. Co.* v. *Fay,*) that a passenger takes all the risks incident to the mode of travel, and the character of the means of conveyance which he selects, the party furnishing the conveyance being only required to adapt the proper care, vigilance and skill to that particular means. For this and this only was the defendant responsible. The passengers can only expect such security as the mode of conveyance affords.

But it is said by the plaintiff, that the improper management

of the train by the employees of the defendant, included not only the conduct of the driver of the engine, but that of the conductor also. That he was chargeable with carelessness, if not recklessness, in directing the plaintiff into a dangerous position, without giving him notice that such position was dangerous, it being a matter entirely within his own knowledge, and not within the knowledge of the plaintiff.

On this point how stand the facts? Did the conductor give any order or direction to the plaintiff by which he was necessarily controlled? It is clear that passengers are, and must be, while upon the cars, under the control of the conductor, and and this for the safety of the train and all upon it. On leaving a train, he can, no doubt, compel them to leave by a particular door or passway, and when he so orders, if an accident happens, the party using all necessary precautions, his employers might be liable, especially if it was at a place where it was not usual to land passengers. Did the conductor order, or direct, or advise the plaintiff to leave the car, while in motion, at the particular place where he did leave it?

What is the testimony? We will leave out of view the evidence given by Bush, the conductor, on the part of the defendant, and that of Lombard, on the part of the plaintiff, with this remark: that the testimony of neither can change the aspect of the case which it is made to assume by the testimony of more indifferent witnesses. And it should be remembered that the testimony of Lombard was taken on a *dedimus*, some weeks, or months after the occurrence, and purports to relate, not what he saw, but what he heard, and we all know how very difficult it is to remember and repeat the precise words of a conversation that is being detailed. That kind of testimony is never satisfactory unless a memorandum of the words has been made at the time of their utterance, or the party has a very special interest in remembering them.

It is always held that the repetition of oral statements must be subject to much imperfection. The party receiving them may not have understood the meaning correctly, or remembered the precise words used, which, if given precisely as uttered, might vary the effect of the statement.

We would be inclined to place more faith in the statements of Bush, given from the stand, subject as he was to a strict cross-examination, than to that of Lombard, without any desire to cast the least reflection upon his testimony. He gave the conversation as he remembered it, doubtless, but who shall estimate the fallacy of human memory?

We lay their statements aside, and take that of Robert E. Goodrich, who, though called by the defendant, does not appear,

by the record, to be interested for either party. Yet his testimony is, for the reasons above given, subject to much imperfection, as being a repetition of what the plaintiff said to him. But in one important particular it corroborates the conductor, and he is corroborated by Dr. Bunce. The plaintiff did not cross-examine him. Mr. Goodrich says:

"I reside in Galesburg; have lived there six years; five years of that time I was railroading; am now dealing in produce. Know plaintiff; heard he got hurt last summer. I had a conversation with plaintiff, I think, the first week of July, regarding his injury. I finally asked him how the accident happened. He went on and gave a statement, that he came into Galesburg on a freight train, and instead of going down to the place where the cars stopped, got off, (having had some conversation with the conductor about supper, and hearing it was too early.) He asked conductor if he could get off, and that the conductor said that business men were in the habit of getting off, and that the train slacked up so that he could get off. I do not recollect the street, but train was running about three miles an hour, and he got up, took his satchel and umbrella, and went to front end of car, and conductor told him he had better, or it was more safe to get off at the hind end. He went to hind end and stepped one foot on platform, and the engine took up slack of train, and pitched him out through the opening at the hind end of car. I asked him if he blamed the conductor, and he said he did not attach any blame to the conductor."

Now this is a succinct, and doubtless a correct statement of the main facts on this point. The testimony of Lombard does not weaken it, nor does his testimony, with that of the conductor, go to prove that he was ordered or directed by the conductor to leave the train at the place he did leave it, nor that the conductor advised it. He advised him to go to the rear door as affording a safer exit than the front door, but of the whole matter the plaintiff was his own adviser. The testimony of Doctor Bunce is nearly to the same effect. Suppose the plaintiff knew without being informed by the conductor, that "up-town people," or business men, usually got off at that place, and had attempted to get off there, and an accident happened, would the defendant have been liable? Should the fact then, that the conductor gave the plaintiff this information, he held to be a direction, or order to him, to get off there, so as to throw the risk on the defendant? We look upon it as mere information given to the plaintiff, who seemed anxious to find a stopping place nearer his own residence, than any of the usual stopping places of such a train, leaving the plaintiff perfectly free to act on his own responsibility. He was of mature age, sharp understanding, and familiar

with the hazards attendant on traveling by a railroad, and if he, and not the defendant, would have been chargeable with negligence if, on his own knowledge that " up-town people " got off there, he attempted to get off, the train being in motion, is he less chargeable with negligence, because the conductor gave him that information ? Surely, it cannot change his position, no matter how he got the knowledge. He was his own master and judge, of what was, and what was not prudent. The information given him by the conductor, that the train slacked up so that he could get off, amounts to no more than this : it is no trouble to carry you a few rods to the usual stopping place, but before reaching it, the train slacks up and runs slow, and business men residing up town often get off. If the plaintiff had previously known this fact, and attempted to get off as business men did, and an accident happened, no reasoning can establish the defendant's liability. It would be pronounced, in business men, or in any other men, as a careless and imprudent act, for doing which they, and not the railroad company, should suffer the consequences. It is a standing precaution, known to every man, woman and child above the age of puberty, who has ever traveled on a railroad, that it is full of danger to leap or step from a car when in motion, and none do it, but those who by practice, know how to regulate and dispose of their own momentum. The information then, given by the conductor, makes it none the less carelessness on the part of the plaintiff. He knew, though the train was for the moment slacked up by shutting off the steam, that the slack was subject to be taken up suddenly, and his own experience told him when it is so taken up it is always with a jerk, affecting the rear car more sensibly, or in a greater degree than any other, and common prudence should have hinted to him that the " cushioned seat " upon which he was sitting, was beyond doubt, the place of greatest safety, and which he should have retained a few minutes longer, until five hundred feet were passed over, and the " scales " were reached. But his anxiety to get home, and get a hot supper, seem to have overcome all his prudential notions, and prompted him to tempt his fate.

It cannot be denied, that the attempt of the plaintiff to leave the car, when it was in motion, was the proximate cause of the injury, for had he remained in his seat as an ordinarily prudent man would have done, putting on steam and taking up the slack, no matter how suddenly, or how violent the jerk might have been, which followed it, would not have harmed him in the least. Bush says, in his testimony, that the plaintiff said, he did not blame him. Lombard does not give this version of the conversation. Laying their testimony aside, Goodrich says dis-

tinctly, the plaintiff said to him " he did not attach any blame to the conductor," nor could he, as the facts show, for however strong may be the desire to throw the fault upon the defendant, the great fact stands out prominent over all others, that the attempt of the plaintiff to leave the car when in motion, at a place not the regular depot or stopping place, was his own uncounseled act, not directed to do it, or advised to do it, by any agent of the defendant, or at their request, nor for their benefit, but solely that the plaintiff might accomplish more speedily a desired purpose of his own. He knew it was dangerous to be on the platform of a car when in motion for any purpose. He knew to attempt to get off a car when moving at the rate of three or four miles an hour, was dangerous, and to do so at one door was more dangerous than at another, and the only part the conductor seemed to have acted on the occasion, was, in attempting to make his exit, by the rear door, as safe as possible, and in attempting to save him as he fell. It is scarcely possible that the plaintiff could have understood the conductor's information, as an order that he should get off where business men sometimes got off. Had the conductor made such remarks as he did to an ignorant boy, or to an inexperienced woman, and they had acted upon them and been injured, carelessness and negligence might be properly chargeable; but the plaintiff was familiar with railroad traveling and had full knowledge of the risks he ran, and was acting upon his own decision.

We endeavored, in the case of the *Chicago and Galena Union Railroad Company* v. *Jacobs*, 20 Ill. 478, by a review of all the American and English cases relating to negligence, to lay down some rules by which it is to be adjudged. Among others we there said, to maintain an action for negligence, there must not only be fault on the part of the defendant, but ordinary care on the part of the plaintiff, must be shown. Neither of these elements are found in this case. We find no negligence, or want of skill, or improper management, on the part of the defendant, as alleged in the several counts of the declaration. The evidence we consider as convincing, that the jerking of the train was inevitable; that it was not by or through the carelessness of the defendant, or negligence or want of skill on his part, that the plaintiff was violently thrown upon the ground and his ankle fractured; that it was not the duty of the defendant to provide a guard chain at the rear end of the caboose, such car being attached to the freight train, more for the use of the employees of the road, into which passengers are not invited to take seats, but permitted only, and the plaintiff, well knowing the car and its safeguards, voluntarily, to avoid a little delay for the passenger train, placed himself in it, taking the risk of

its safety; that this was a regular freight train, and nothing else; that the defendant did not undertake, improperly, to discharge the plaintiff from the train before it had arrived at the station house or depot of the defendant, and while the cars were in motion, but that the discharge of the plaintiff, at the time and place, and when the cars were in motion, was at his own instance and choice. The accident, therefore, was occasioned by his own want of ordinary care.

The case of the *Galena and Chicago Union Railroad Company* v. *Yarwood*, 15 Ill. 469, and the case of the *same plaintiffs* v. *Fay*, 16 Ill. 567, and *Same* v. *Jacobs*, 20 Ill. 485, settle the law of this, as arising on the facts as alleged in the declaration.

In those cases this court held, in Jacobs' case, that two things must concur to support this action, negligence on the part of the defendant, and no want of ordinary care on the part of the plaintiff, and that the question of liability does not absolutely depend on the absence of all negligence on the part of the plaintiff, but upon the relative degree or want of care, as manifested by both parties. This case shows a want of ordinary care on the part of the plaintiff. In the cases of Yarwood and Fay, it was held, that passengers took the risks incident to the mode of travel, and the character of the means of conveyance which they select, the party furnishing the means being bound only to adapt the necessary care, vigilance and skill to those means, the carrier and passenger owing reciprocal duties each to the other, and if a passenger on a railroad car is guilty of negligence by unnecessarily exposing himself to danger, or by imprudently and unnecessarily passing from one car to another while the train is in motion, and receives an injury, and his carelessness or imprudence has contributed in any way to produce the injury, he cannot recover for it; and if such passenger is chargeable with a want of reasonable care, and his want of such care concurs with that of the railroad company in producing an injury to him, he cannot recover for it. These cases, particularly that of Fay, adopt the reasonings and rule laid down in *Foreset'r's case*, 11 East, 60, that a passenger suing for an injury must show not only that the injury to him was the result of the carelessness or negligence of the defendant, but also, that he himself was without fault in producing the injury; and the burden of proof is on him to show that the defendant was negligent, and that he himself was not guilty of negligence. The expression, in this case, of " any negligence" by the plaintiff, must be understood as explained in *Jacobs' case*, 20 Ill. 485, where it is said, that all care or negligence is at best but relative, the absence of the highest possible degree of care shows the presence of some degree of negligence, slight as it may be, and that the true

doctrine is, that in proportion to the negligence of the defendant should be measured the degree of care on the part of the plaintiff. The degrees of negligence should be measured, and compared and considered; and whenever it appears that the plaintiff's negligence is slight, as compared with the defendant's greater or gross negligence, he must not be deprived of his action. 20 Ill. 496–7.

We are referred by the plaintiff to the case of this *same Company* v. *George*, 19 Ill. 517, under these points we have been discussing. We adhere to the ruling in that case, as we understand it, with the qualifications in Jacobs' case. We hold, in this case, as in George's case and in the other cases cited, that carriers of passengers for hire are bound to use the utmost care and diligence in providing for the passengers' safety, by the use of proper and safe means of conveyance. The care required is not that care without the exercise of which accidents may happen; as, for example, after a passenger is received on board, he would be safer, less liable to accident, if locked up in the car, or chained to one of the seats or other fixture, so as to deprive him of locomotion—moving from car to car. This would be the very utmost degree of care and caution, but that is not required, so that the epithet "utmost" must be taken with some qualification. It is very difficult to define the degree of care requisite. In *Boyce* v. *Anderson et al.*, 2 Peters, 150, which was a case against the owners of a steamboat, employed in carrying property and passengers on the Ohio and Mississippi rivers, for the loss of some negroes by the upsetting of the boat's yawl by bad management, Chief Justice MARSHALL held, that the responsibility of the carrier should be measured by the law applicable to passengers, rather than by that applicable to the carriage of common goods, and that the rule of care is that of ordinary care—the care which all bailees for hire owe their employer.

The rule, however, in more modern cases, as in *Stokes* v. *Saltonstall*, 13 Peters, 190, is much more rigid. There it is held, if the disaster was occasioned by the least negligence, or want of skill or prudence on the part of the defendant Stokes, who owned the coach, he would be liable. This is the rule of this court, as explained in the Jacobs case, where we hold, that the negligence of the defendant is to be measured with that of the plaintiff, and for the excess only, as against the defendant, can the jury find a verdict. From all the cases, we can gather this rule of care and diligence—that its extent is to be measured by the known perils to which passengers are exposed by the particular kind of conveyance. The more hazardous the mode, the greater the care and diligence required by both parties. The liability can only be discharged by showing

that all reasonable skill and diligence have been employed, as well by the plaintiff as by the defendant.

But it is argued by the plaintiff, that the jury having found the facts alleged in the declaration, this court cannot, without stultifying itself, and without invading the rights of the jury to decide the facts, reverse their finding, by declaring they do not exist, and that no negligence or carelessness on the part of the defendant was proved. Such a decision, he contends, would render useless trials by jury, and would be an invasion of the constitutional rights of the citizen. But has not the court rights and duties to perform, equally as important as those of a jury? This court is clothed with power by express statute, to consider a case on the evidence, else why is the evidence certified up to this court? This court will look into the error which questions the finding of a jury, whether upon the law or the evidence, and the evidence is preserved in the record, by bill of exceptions, for such purpose. This court can, and will, and uniformly does, in a proper record, scan the evidence, and if the finding of the jury is palpably against the evidence, or there be no evidence to sustain the finding, what is this court to do? Why, clearly, so to pronounce; to set aside the verdict, and remand the cause for a new trial, if proper so to do. The citizen has no constitutional right to an unjust verdict, and the trial by jury would be worse than useless if there existed no supervisory power over them, to correct their errors, or as it may happen, to arrest them in a palpable and glaring attempt to do injustice. This court has a right to look into the whole record, into the facts as well as into the law, and adjust the scales which a jury may have improperly or unjustly disturbed, always regarding the rules for interference, which long custom and correct principle have sanctioned, and to which we have already adverted, and now obey.

The next point argued at length, by the plaintiff, is, the amount of damages, in reply to suggestions of the defendant that they are excessive. The plaintiff insists that this depends mostly upon the nature, extent and permanency of the injury; the effect it has produced and is likely to produce upon the physical condition of the plaintiff; his pain and suffering, both mental and physical, past and future; the effect it has upon his pecuniary interests, both as regards the expenses occasioned by the injury, and the effect it has upon his business. These are proper elements to be considered, in estimating the damages, and as to them what are the facts? No one of the surgeons describe a very serious injury. Though it may be a permanent injury, that does not make it very serious, like the loss of a limb, a hand, or foot, or an eye. It is merely, if we understand

them, the displacement of a small bone of the foot called the astragalus—the ankle bone, knuckle bone or sling bone, as it is sometimes called. Displacing this, turns the foot in and the toes downward. But if it is replaced, or the bone taken out, those surgeons do not say he will be disabled. Dr. Brainard says, if the displaced piece was taken out, he would have a strong and useful foot; but the foot would be flattened, the ankle stiff, and the limb an inch shorter. He thinks the bone will be likely to unite by ligaments, which nature forms, and when formed and united, he will not lose the motion he now has, and this motion may increase when it shall become fully united; will have to walk on the side of his foot, which may produce swelling, but if care is used, no danger of any abscess.

This, though painful enough, is nothing to the loss of the foot, the hand, eye, arm, or any other prominent limb. It is simply a displacement of the ankle bone, the most serious effect of which will be to cause the plaintiff to limp some, requiring, probably, the use of a cane to assist him in walking. His physical condition, as a whole, cannot, from the nature of the injury, be affected in any way. The pain and suffering hitherto has been, unquestionably, very great, and may be repeated, if an operation becomes necessary, of which there is no great probability, if he is careful, and refrains from using his foot until the parts are accommodated to each other. The expenses of his cure would also be a legitimate subject of inquiry, and can be very nearly estimated. One of the surgeons, who seems to have had the case in charge, thinks his bill will be as much as one hundred dollars, and that of the nurses, we should think, would probably be as much more. Here then is one item pretty accurately ascertained, if damages can in any event be allowed. For pain and suffering, the jury would have a right to be liberal in a proper case, and there is no fixed rule by which, in this estimate, they are to be governed, keeping in mind all the time, that though they may give damages, they must not be so great as to carry with them the appearance of being the progeny of prejudice, passion, or other unworthy motive. The effect the injury is likely to produce on the professional business of the plaintiff, would also be taken into consideration. He is known to be a gentleman of high standing at the bar, with many clients, and with a lucrative practice extending to Chicago, and in the most important court there. How is this injury to affect that practice, and his professional earnings from it?

This is, by far, the most important inquiry of all, and on which little or no evidence was given. Mr. Beardsly stated, that the plaintiff had been doing a large business, requiring him to be away from home—generally in the courts of the

United States. He went last October, four months after he had received the injury, to Chicago, to attend court. At July term, he had about one hundred cases which were continued, whether on account of his inability to attend to them it is not stated, or that there was any loss resulting from such continuances; he attended the September term in Knox county, about two months after receiving the injury—the fall term at Chicago, and last term at Chicago, of the United States Court— all within a few months after the accident. No loss is proved, as resulting from the injury, in his practice, nor can we see how he is in any manner disabled from pursuing his profession with the same ardor, with the same efficiency, and with the same profitable results as heretofore. His lameness, even if he has to be supported by a crutch or cane, will in no degree interfere with his office business, or with his pleadings in court, or with his studies in his chamber, or paralyze his laudable efforts to climb the steep

"Where Fame's proud temple shines afar."

The plaintiff, to his praise be it said, is an eminent attorney and counselor, skilled in drafting bills in chancery, special pleas, and in the preparation of able and voluminous briefs in important cases, and in arguing from them; how can this injury of the ankle diminish his power in these respects? Would he not, crippled as he says he is, be justified in demanding as large fees for the exertion of his brains, as before the injury? Can he not go from home to Chicago, and elsewhere, with the same ease he was wont to travel? Certainly, unless this accident shall have made him timid of railroad traveling, which is not at all probable, and especially if a large sum of money is to be derived from a comparatively slight accident. Will his income be less by what has befallen? The plaintiff says the jury did not find enough—they should have found sufficient to enable him to have retired from business, supporting his family on the interest of a fund the jury should have placed at his disposal, and giving them as good a support as he could furnish in the pursuit of his business. If this is a proper view of the case, then certainly the jury have failed in their duty. The support of the plaintiff's family cannot fall short of two thousand dollars per annum. A fund to yield this amount at six per cent. should be thirty-three thousand three hundred and thirty-three dollars and thirty-three cents, and that should have been the verdict of the jury. But that is not the view to take—the one we have presented is the true view. How much are his professional receipts diminished, or likely to be diminished, by reason of this accident? The plaintiff is in the prime of life, in good health, and in the full enjoyment of all the faculties necessary to enable him

to pursue his profession with all the industry and energy he may invoke, save, perhaps, the necessity of limping slightly, in going to and from the various courts he attends.

Should a person whose avocations in life are not professional, but dependent for success on the free use of all his limbs, be injured, the proper inquiry in such case is, to what extent is he disabled? If a carpenter, blacksmith, or other person whose living is obtained by manual labor, should be crippled in his hand, in so far as that detracts from his power of earning his accustomed livelihood, so far should the jury give him damages over and above the usual damages for the pain and suffering, medical attendance, loss of business whilst confined, etc. So with every other profession. There is a total absence of evidence here, to show that the plaintiff has lost or will lose one dime less of income from his practice now, than he received prior to the accident. It was not in the nature of things or of the injury, that he should.

In the absence of all necessary proof on this important point, who will not say that the damages are excessive? Even if we have erred on the question of negligence, no circumstances of aggravation are shown against the defendant, and if negligent at all, it was very slight, and not to be visited by vindictive damages as these unquestionably are. Their magnitude, in full view of all the facts of the case, compel the belief, that the jury who gave them, was influenced by that popular prejudice existing all over the country against railroad corporations. This should not be. Juries should remember that railroad accidents are not always produced by the misconduct of agents and employees, but a large proportion of them, by the carelessness and recklessness of passengers. This our experience tells us. It is a great evil, and it would be a sin to encourage it, by allowing a premium on it, to be extorted from companies. However bad their behavior may sometimes be, it would not be improved by making them pay for faults not their own.

The law where death occurs by the negligence of a railroad company, no matter who the deceased may have been, howsoever distinguished, and however successful in reaping the fruits of his professional skill, or how enormous they may annually have been, cannot give to his widow and children or next of kin, more than five thousand dollars. The plaintiff has the same power now, that he ever had, to provide for his family. If five thousand dollars is compensation for the loss of the prop and stay of the family, is not eleven thousand dollars excessive damages, when the head of the family is no further disabled than a dislocated or fractured ankle?

Whilst we shall hold railroad companies to a strict performance

of all their duties, at the same time we must give them, as we give all other suitors in court, the benefit of all the rules of law and principles of justice. The judgment is reversed, and the cause remanded.

CATON, C. J. I am of opinion that here was negligence by both parties, and on that ground concur in reversal.

WALKER, J. I am of the opinion that there was such a degree of negligence on the part of the appellee, as should prevent his recovery, and that the judgment should be reversed.

*Judgment reversed.*