# THE CHICAGO AND ROCK ISLAND RAILROAD COMPANY

*v.*

# JAMES McKEAN.

1. NEGLIGENCE IN RAILROADS — *in reference to warning boards, and ringing a bell or sounding a whistle on approaching a road crossing — and herein of relative negligence.* The omission on the part of a railroad company to ring a bell or sound a whistle continuously for the required distance on approaching a road crossing, renders the company liable "for all damages which shall be sustained by any person by reason of such neglect." But it was not intended that this omission of duty should *per se* render the company liable for damages for injuries; the injury must be shown, by circumstances at least, to have been the consequence of, or caused by, such neglect.

2. And while railroad companies should be held to a strict accountability for the omission of duties enjoined by statute, such as giving the signal continuously the required distance on approaching a crossing, and erecting and maintaining warning boards at such crossings, on the other hand, individuals must be required to do their whole duty. It is the imperative duty of persons traveling on a public road, crossed by a railroad on the same level, to use all the faculties they have, on approaching the crossing, to discover a train, not only by listening for bell or whistle, but to look out, by all means, whether there be a warning board or not to enjoin that duty upon them. They must use all reasonable means in their power to prevent accidents.

3. And where a person, on approaching a railroad crossing with a team, does not avail himself of his sense of sight and hearing, when by the proper exercise of it he could have avoided a collision, he will be regarded as unusually negligent on his part, though the bell was not continuously rung or the whistle sounded.

4. In this case, which was a suit to recover damages for an injury to the plaintiff and his team by a collision with a locomotive at a road crossing, while a majority of the court gave no opinion on the question of relative negligence, Mr. Justice BREESE, who delivered the opinion, regarded the conduct of the plaintiff, in failing to exercise proper caution in approaching the crossing, as contributing very essentially to produce the accident, and says that in cases quite similar to this, very respectable courts have ruled against

the plaintiff, manifesting the same degree of negligence, and reviews the cases on that subject.

5.  NEW TRIALS—*excessive damages—and herein of the measure of damages in actions for personal injuries.* A wagon and two-horse team, being driven by the owner along the highway, came in collision with a locomotive at a road crossing; the horses were killed, and were worth $300 or $320, the wagon was injured $35 or $40, the harness $25. The owner lost the toes off his left foot. He paid for surgical attendance $138.50, and nursing twenty-six days $78. He was a farmer. It did not appear the company's employees acted willfully. A verdict of $5,875 for the plaintiff was regarded at "first blush" outrageously excessive, and the result of passion and prejudice, rather than of cool reflection; and a new trial was awarded on that ground.

6.  It is a familiar principle, that in actions for personal injuries, juries may give exemplary or punitive damages in cases of willful negligence or malice, but it is requisite such a case should be made.

7.  In the absence of an intention to do the injury, however, a different measure of damages should be resorted to by the jury.

8.  When railroad companies procure the services of the best men that can be had, it would seem unreasonable to punish them immoderately for a neglect on the part of their employees of a statutory duty, even if it could be safely affirmed the accident was wholly occasioned by this neglect.

9.  While the case of a railroad train, running regardless of law, demands at the hands of a jury, something more in the way of damages than a mere individual, and this for the protection of the public, yet the verdict should not be so excessive as to show it was the result of improper motives.

10.  While every traveler on a highway crossed by a railroad is entitled to the benefit of the signal required by the statute, at the same time, it cannot be said that a party who could both see and hear the train in time to avoid it, and did not use the proper means, or any means, to avoid it, should have vindictive damages.

11.  REFUSAL TO GRANT NEW TRIALS—*may be assigned for error.* By the common law, the refusal to grant a new trial could not be assigned for error, and such was the law in the State until the passage of the act of July 21, 1837, allowing exceptions to be taken to decisions of the Circuit Courts overruling motions for new trials, and assigning error thereon. This statute bestows upon the Supreme Court the power to supervise every verdict that may be rendered in any of the courts of record in this State; this control, so bestowed upon this court, is unqualified and unlimited.

12.  SAME—*limitations of the power.* Yet with a view to abridge this power, the court has, in numerous cases, laid down certain rules by which it would be governed in disposing of such cases; and the rulings upon that subject are reviewed in the opinion in this case.

13.  SAME—*verdict against the evidence.* In this case, which was a suit against a railroad company to recover damages resulting from a collision of a

train with a wagon and team at a road crossing, the court said, looking upon the testimony of the company in the most favorable light, the jury might have inferred there was a reasonably strict compliance with the statute requiring a signal to be given on approaching a crossing, if they believed the witnesses, and nothing appeared to show why they should not believe them, yet as other witnesses gave evidence quite variant from that of the company, they would not invade the province of the jury by disturbing their finding in that regard, which was against the company, even though their finding might be against the weight of evidence.

14. WEIGHT OF EVIDENCE—*how ascertained.* The weight of evidence does not depend upon, nor is it made up of numbers of witnesses, but of the matter sworn to, and the position of the witnesses, and their attention and capacity to hear or see, as the case may be, are elements to be taken into consideration in weighing testimony.

15. EXCEPTIONS—*when necessary.* The ruling of the Circuit Court, refusing to grant an application for a change of venue, cannot be assigned for error unless an exception was taken thereto.

16. And the same may be said in respect to the decision of the court refusing to suppress portions of certain depositions.

APPEAL from the Circuit Court of Bureau county; the Hon. MADISON E. HOLLISTER, Judge, presiding.

The opinion of the court contains a sufficient statement of the case.

Mr. GEORGE C. CAMPBELL, for the appellants.

Mr. GEORGE W. STIPP and Mr. OLIVER C. GRAY, for the appellee.

Mr. JUSTICE BREESE delivered the opinion of the Court:

This was an action on the case brought to the Bureau Circuit Court by James McKean, against the Chicago and Rock Island Railroad company, to recover damages for an injury occasioned by a collision of a train of cars run by the defendants with a two-horse team and wagon of the plaintiff.

The injury was alleged to be in killing the horses, injuring the wagon and harness, and rendering the plaintiff " a cripple for life by the loss of a large portion of his left foot."

The jury rendered a verdict for the plaintiff of $5,875, on which, after denying a motion for a new trial, the court entered judgment.

To reverse this judgment, the case is brought here by appeal, a bill of exceptions having been duly signed, containing all the testimony, and various errors are assigned on the record.

The first point made by appellants is, the refusal of the court to award a change of venue on notice and affidavit filed.

There being no exception taken to the ruling of the court on this point, it is not before us for consideration, and the same may be said in regard to the second point, refusing to suppress portions of certain depositions offered by the appellee. There was no exception taken to this ruling.

The first exception taken, which appears on the record, is in overruling the motion for a new trial, and this brings before us all the evidence in the case, and on the force to which it is entitled, we are required to pronounce.

By the common law, and the practice under it which prevailed for ages, the refusal to grant a new trial could not be assigned as error. Such was the law and the practice in this State up to 1837, when the legislature, in its wisdom, declared by an act of July 21, of that year, that exceptions taken to opinions or decisions of the Circuit Courts overruling motions for new trials should be allowed, and the party excepting might assign for error any opinion so excepted to. Laws of 1837 (second sess.) 109.

This statute bestows upon this court the power to supervise every verdict that may be rendered in any of the courts of record of this State. The evidence upon which they are found may be brought in review before this court, for it will not investigate the question of a new trial moved for, on account of defective evidence, unless the whole of the evidence is shown in the record brought here. *McKee* v. *Ingalls*, 4 Scam. 30; *Clark* v. *Willis*, 16 Ill. 61.

The policy of this legislative enactment has been, and may well be questioned, as it brings before a tribunal, other than a jury, that which, in the institution of trial by jury, was for

their determination alone, that is, the facts of a case. An appellate court was, before the passage of that act, judge of the law only, to decide wherein, in the case brought before it, the rules of law had been misapplied or violated. The old and honored maxim once was, " the judges respond to the law, the jury to the facts," but now, by this innovation, the judges of an appellate court have as much power over the facts as the jury had in the first instance, for it is undeniable this court may set aside a verdict if the facts fail to satisfy it of its propriety. This control, so bestowed upon this court, is unqualified and unlimited, and therefore we say, the verdict of every jury is subject to the control of this court.

Yet, with a view to abridge this power, very soon after the passage of the act, this court laid down certain rules by which it would be governed in disposing of such cases.

The first case which came to this court, after the enactment of this statute, was the case of *Smith* v. *Shultz*, at December Term, 1838, by appeal (1 Scam. 490), where it was *held*, the court would not grant a new trial, when, in its opinion, substantial justice had been done, though the law arising on the evidence would have justified a different result. In subsequent cases this rule was recognized, that unless the verdict of the jury is manifestly against the weight of evidence it will not be disturbed. *Allen* v. *Smith*, 3 Scam. 97; and followed by the cases of *Ellis* v. *Locke*, 2 Gilm. 459; *Evans* v. *Fisher*, 5 id. 572; *Dawson* v. *Robbins*, id. 72; *Mann* v. *Russell*, 11 Ill. 586; *Welden* v. *Francis*, 12 id. 460; *Town of Vinegar Hill* v. *Busson*, decided at this term.

This rule is also well established, where the verdict has been given contrary to the evidence, or where there is no evidence at all to support it, this court will grant a new trial. *Lowry* v. *Orr*, 1 Gilm. 70; *Scott* v. *Blumb*, 2 id. 595; *Culbertson* v. *City of Galena*, id. 129; *Gordon* v. *Crooks*, 11 Ill. 142; *Keaggy* v. *Hite*, 12 id. 99; *Baker* v. *Pritchett*, 16 id. 66; *Higgins* v. *Lee*, id. 495; and other subsequent cases closing with the case of *Corgan* v. *Frew*, 39 Ill. 31; in which last case it was said in

addition, " or where the jury have misapprehended the law or the facts, or both," the verdict will be set aside.

To determine correctly the question of a new trial by the appellate court, on the evidence, it is requisite, therefore, that all the evidence should appear in the record, as held in *McKee* v. *Ingalls*, and *Clark* v. *Willis, supra.*

Another rule equally important is this, that the court will not disturb a verdict upon facts, for any slight preponderance in testimony. *Bloomer* v. *Denman*, 12 Ill. 240; *Goodell* v. *Woodruff*, 20 id. 191. But if there is a strong preponderance, the verdict will be set aside, especially where apparent injustice has been done. *Chase* v. *Debolt*, 2 Gilm. 371; *Boyle* v. *Levings*, 24 Ill. 223; *Clement* v. *Bushway*, 25 id. 200.

Again, this court said, a verdict will not be disturbed unless the finding is clearly wrong. *French* v. *Lowry*, 19 Ill. 158; *Bush* v. *Kindred*, 20 id. 93; *Carpenter* v. *Ambroson*, id. 170; *School Inspectors of Peoria* v. *Hughes*, 24 id. 231; *Cross* v. *Carey*, 25 id. 562. And, further, that a verdict will not be set aside where the evidence is conflicting, even though it may be against the weight of evidence. *Morgan* v. *Ryerson*, 20 Ill. 343; *Martin* v. *Ehrenfels*, 24 id. 189; *Pulliam* v. *Ogle*, 27 id. 189. And in actions *ex delicto*, it is seldom that courts will interfere with the finding of a jury. *Fish* v. *Roseberry*, 22 id. 288.

This right of revising motions for new trials on the evidence preserved in the record was conferred on the appellate court for some practical purpose; it was not intended it should be nugatory, but it was supposed, that, by its fearless and wise exercise by such a court, benefits would result to the citizen, and some protection be afforded to parties litigating, who had been or might be in the power of a tribunal composed of twelve men, wholly irresponsible, the common law writ of *attaint* having been abolished,—a tribunal which has not always been found very deeply imbued with a knowledge of the law, when called on to apply its principles to the case before it,—a tribunal not remarkable, as usually selected, for its skill in analysis, or in the examination of facts, or in estimating their force, and made up from persons who are not, as daily experience shows, wholly

devoid of prejudice, or entirely uninfluenced by passion, or unaffected by popular opinion.

The points made by the appellants on this record, and most elaborately urged upon the attention of the court, are this refusal of the court to award a new trial on the evidence, which is all preserved in the record, and for the amount of damages allowed, which they insist are outrageously excessive.

The counsel for appellants say that the appellee, by his own proof, was, at the time of the accident, in the full possession of all his faculties and perfectly sober, and that the accident could not have happened without his own negligence. We are free to admit there is much evidence tending to show the accident was the result of the negligence of appellee. It is in proof appellee was well acquainted with this crossing; but appellee insists, as the warning board was not up at the time, the benefit of which, if it be any to one acquainted with the crossing, was lost to appellant, and negligence for suffering it to be down and placed against the fence is imputable to appellants. The law requires, in the most positive terms, that such boards shall be placed and constantly maintained across each public road or street where it is crossed by a railroad on the same level, as in this case. The law demands that these boards shall be elevated so as to be easily seen by travelers, and on each side of them there shall be painted, in capital letters of at least the size of nine inches each, the words, " Railroad crossing—look out for the cars while the bell rings or the whistle sounds." This is a requirement of law with which all railway companies are bound to comply, however useless such boards may be to travelers accustomed to the crossings, or to cautious men who will not, ordinarily, fail to " look out " at such places, whether the bell rings or whistle sounds, or give no signal.

This signal is also an imperative demand of the law. A bell of at least thirty pounds weight, or a steam whistle, must be placed on each locomotive, and it must be " rung or whistled " at the distance of at least eighty rods from the crossing, and be kept ringing or whistling until its locomotive shall have crossed the road. The penalty for failing to observe

this very necessary regulation, is fifty dollars for every neglect, to be paid by the railroad company, one-half thereof to go to the informer, and the other half to the State; and the corporation is also made liable for all damages which shall be sustained by any person by reason of such neglect.

The evidence on this point is conflicting. One witness, *James H. Robertson*, sworn for appellee, says, he means to swear positively that no bell rung or whistle sounded, and that he thought of it at the time.

*Charles Wilkinson*, who was on the train, swears that no whistle was sounded, but is not sure about the bell.

*Lyman J. Wilkinson* swears that he was about thirty rods from the crossing, and he heard no bell or whistle, and has not a particle of doubt if they had rung the bell or sounded the whistle he would have heard it.

*Isaac A. Mantier* swears he was on the train and heard no bell or whistle, and is confident no bell was rung or whistle sounded; thought of it at the time.

*Lester O. Philips* swears he was thirty rods east of the crossing, and the train was within fifteen or twenty rods of him before he noticed it; he saw it before he heard it; had heard it blow at Tiskilwa; was expecting it, and often looking back; there was quite a strong breeze; heard nothing of the train after he heard it in Tiskilwa, and did not hear bell or whistle, and ought to have heard them.

*Joseph Ruff* swears he was on the train; got on at Tiskilwa; saw the team go by; it seemed in opposite direction of the train; heard no bell or whistle; was sitting alone, thinking how often trains went by crossings without ringing or whistling; if they had rung or whistled continuously he certainly would have heard them; if the bell had sounded once or twice he would certainly have heard it.

*James Marshall* swears that he saw appellee between the crossing and the bridge, ten or fifteen rods from the crossing; that witness went on to the bridge a distance of fifteen or twenty rods from where he met appellee, before he noticed the train; the first notice he had of the train he saw it coming,

15—40TH ILL.

was on the bridge (across the ravine) at the time the train passed him; the train was east of "Plow Hollow" crossing when he first saw it; heard no bell or whistle; thinks he could have heard them; had generally before.

This was all the testimony on the part of appellee as to ringing the bell or sounding the whistle.

On behalf of appellants, *Loran Pease* testified, that he was on the train at the time of the accident, and was in the baggage car, and was a passenger; heard the bell ringing just before they got through the "Backbone," and heard it ringing below there fifteen or twenty rods; knew they hit something at the crossing, as they stopped ringing; they rung just before they got through the "Backbone;" heard ringing after that just down below there a little ways, perhaps a little over one hundred rods from "Backbone;" don't think they rung more than fifteen or twenty rods.

*Benjamin Newell* was a passenger on one of the passenger cars, and heard the whistle blown just west of the "Backbone," and also at the crossing where the accident happened; does not remember about the bell; did not notice the ringing of the bell at all, but the whistle was what attracted his attention about the time they made the crossing where the accident happened; heard the whistle west of the "Backbone," and also after they passed it; when he heard the whistle loud, he spoke up and said "what's up?" noticed that they whistled unusually loud and looked out, but saw nothing but the dust; does not know whether the bell was rung or not, but the whistling was quick at the crossing.

*Sterling Graves* testified that he resided about three-fourths of a mile east of Tiskilwa, on the north side of the railroad; remembers the day appellee was hurt; was sitting at the window of his house, and heard the whistle sound at the time the train came through the "Backbone;" the bell commenced ringing after they got through the Backbone, and thinks it rang until they crossed the crossing just east of his house; this is the "Plow Hollow" crossing, and is about eighty rods from the crossing where the accident occurred; heard the bell after

the train passed the "Plow Hollow" crossing; thinks the whist-ling commenced west of the " Backbone ;" the bell commenced when they were about half-way from the "Backbone" to the " PlowHollow" crossing; this crossing is just forty rods east of the "Backbone."

*Elisha A. Leach* testified he was the baggage man on the train when appellee was hurt, and was in the baggage car; the whistle was sounded at the whistling post west of the "Plow Hollow" crossing; after they got through the "Backbone," they commenced ringing the bell, and rung until they got through the "Plow Hollow" crossing, and after they got to the post they rung until they came to the crossing below; looked through the window and saw the engineer with his hand on the bell-rope pulling it; *Loran Pease* was in the baggage car with him; was standing by the box that carries the tools of the company; there were two panes of glass in the door at the front end of the car; he was about twelve feet from the window, and it was about twenty-two feet from them to the engineer; was not busy, was looking at the engineer and fireman; the side door was open at the time; does not recollect hearing the whistle at the crossing when appellee was hurt; did not see the fireman take hold of the bell-rope; it is about sixty rods between the two crossings; should think the engineer rang about half-way.

*Israel Crocker*; the engine driver, testified, after producing a release by the appellants, that he was sitting down on his seat on the right side of the engine, and took hold of the whistling rod and sounded the whistle until they got to the whistling post, some ten or twelve rods, and he then took hold of the bell-cord with his right hand and pulled it half a dozen times, and then changed to his left hand, and continued ringing the bell until they got half-way between the little dry run, some fifteen or sixteen rods ; the fireman then raised up and continued ringing until they struck the team ; the fireman had been putting wood into the engine (fire box); witness had to raise up to take hold of the bell-rope; his window was open; the road curves to the left there ; while ringing the bell, and while he was standing with his left hand on the bell-rope, and his right hand on the

throttle valve, in that position he could not see more than three or four rods of the length of the track; had to stand in that position to ring the bell; the first he saw of the team was when the train was not a rod from the crossing; saw a horse's head, and shut off the steam and grabbed the whistling rod to brake up; fireman rang the bell when he got through firing, which was when they were within ten or twelve rods of this crossing.

*James Kaele,* the fireman, testifies, that he quit wooding about twelve or fifteen rods from the crossing, and then rang the bell; was about six rods from the crossing when he first saw the team; took the bell-cord from the hand of the engineer; he had been ringing it from below the other crossing till witness took hold of it, and was then ringing it; did not let go the bell-cord, until he jumped behind the boiler at the moment of the collision; there was whistling done down at the "Backbone;" could not say for certain there was whistling at this crossing; I saw Crocker shut off the steam, but don't know whether he whistled or not.

This is all the evidence on the first point, and we have been particular in quoting it because it is made important by appellants, and which their counsel has greatly elaborated, contending in his argument, that the weight of evidence greatly preponderates in favor of the appellants, as to their compliance with the statute.

There is much evidence by persons in positions to know the fact, that the bell was rung or the whistle sounded from the whistling post to the moment of collision, and the jury might so have found, although a greater number of witnesses on behalf of the appellee, testified, one of them, Robertson, positively, that no signal was given, and others that they did not hear either bell or whistle and ought to have heard them had they been sounded. The weight of evidence does not depend upon, nor is it made up of numbers, but of the matter sworn to, and the position of the witnesses, and their attention and capacity to hear or see, as the case may be, are elements to be taken into consideration in weighing testimony. Looking upon the testimony of appellants, in the most favor-

able light, the jury might have inferred there was a reasonably strict compliance with the statute, if they believed the witnesses, and nothing is apparent on the record, why they should not have believed them; yet, as other witnesses gave evidence quite variant from that of the appellants, we will not invade the province of the jury by disturbing their finding in this regard, even though their finding may be against the weight of evidence. *Morgan* v. *Ryerson*, 20 Ill. 343; *Martin* v. *Ehrenfels*, 24 id. 189; *Pulliam* v. *Ogle*, 27 id. 189.

Now, what are the consequences of this neglect of duty to ring the bell or sound the whistle continuously? It is visited by a penalty of fifty dollars, and renders the negligent party liable "for all damages, which shall be sustained by any person by reason of such neglect."

This legislation may be regarded in a two-fold aspect: one in which the public alone is concerned in the imposition of the penalty; the other, individuals only, who may be injured, and may be able to show the injury was occasioned "by reason of such neglect."

The demands of the public would seem to be satisfied by the recovery of the penalty, but an individual suing for damages must be able to show they were the legitimate and probable consequences of such neglect. And this is a just and reasonable provision. While railroad companies are punished for the violation of a positive law, individuals, at the same time, are permitted to recover such damages as they may have sustained by reason of the violation. It is very evident the legislature did not intend to declare, nor have they so declared, that this omission of duty shall, *per se*, render them liable to damages for injuries. The injury must be shown, by circumstances at least, to have been the consequence of, or caused by, such neglect. It is insisted, in this aspect of the case, by the counsel for appellants, that if neither of the required signals was given continuously, yet appellee was in a position, for some rods before he reached the crossing, to see and hear the train, as it was a long one, composed of six passenger cars, besides the engine, tender and baggage cars, and moving on a plane

elevated from three to five feet above that of the highway on which he was traveling, and at a distance for more than sixty rods of not more than eighty feet apart, and that distance growing less as the crossing was approached, both parties going in the same direction on lines slightly converging, until the crossing was reached, at an angle of about twenty-four degrees.

What, on this point, are the facts? The train was running about thirty miles an hour, going east. Appellee was going in the same direction, at a speed of about three miles an hour, in an open wagon. The wind was fresh, and from the direction the train was coming. From the " whistling post," west of the " Backbone," to the crossing, where the accident happened, the distance is eighty rods, and the ravine spoken of is about half-way, or forty rods. Throughout nearly this whole distance of eighty rods, the railroad is within eighty feet of the highway, which is on the north side, and in some places less. From the ravine to the crossing the view of the railroad is, for the most part, judging from the plats and the testimony, wholly unobstructed, and it runs upon a plane varying from five to three feet above the level of the highway until the crossing is reached, and that is reached by an ascending plane of about three feet for several rods.

Taking the testimony of Mr. *Winship*, county surveyor, who made a plat of the roads and crossings, and who was examined as a witness by the appellee, and his plat put in evidence, and of *George Wilkinson* on the same behalf, and of *J. J. Henon* and *Alexander Boyd* on behalf of the appellants, it seems almost impossible to come to any other conclusion but that appellee, for many rods before he reached the crossing, saw the train, as it was in plain view, and the rattle of its wheels and discharge of steam could be distinctly heard. *Henon* says most distinctly, that he does not think the trees would be in the line of view of a person thirty-five feet from the crossing, for the simple reason that they were not when he was there. It needs no testimony to prove it would be heard by any person not deaf, and this appellee is shown to have been in the full possession of all his faculties, and he was in an open wagon. It is preposterous

and absurd to contend that a train of six passenger cars, drawn by a locomotive, with its tender and baggage cars, could not be heard at a distance less than eighty feet. *Henon* testifies, when he was at a point on the highway one hundred feet from the crossing he could see the wheels of the coaches and the tops of the cars also; that there are places where some portion of the train would be hid, but no point where the whole train would be. He states the bushes inside the railroad fence were none of them ten feet high, and the butts were but a little thicker than his thumb.

We think the evidence goes strongly to show that, from the ravine, which is forty rods west of the crossing, the train of cars could be seen and heard at every few yards of way. Half-way between the crossing and this ravine, *James Marshal,* going west, met appellee and spoke to him, he then driving his horses in a walk. By the time Marshal reached the bridge across the ravine he was abreast of the train of cars, which was in plain sight and hearing, not more than seventy-six feet distant from him. This ravine, as crossed by the railroad, is forty rods from the crossing, which would be passed over by the train while appellee's team was passing over four rods, so that it is apparent that, by the time appellee, after meeting Marshal, had not approached the crossing by several rods before the train was in sight and hearing. And it is shown by the testimony of *James Karle* that appellee must have seen the train in time to avoid the accident had he used the ordinary caution a prudent and careful man would have used on approaching a crossing, with which the proof shows appellee was familiar. This court has said, in the case of the *C., B. & Q. R. R. Co.* v. *Triplet,* 38 Ill. 488, that prudence requires all persons, before they attempt a crossing, should examine the road to ascertain if a train is approaching. *Karle* says they were coming up to the track—the off horse seemed to be a little ahead, and seemed fractious, as though he saw the engine. They were from sixteen to eighteen feet of the track; saw the man in the wagon; he motioned the rein of the near horse; whether he meant to strike the horse or to change hands could not say, but saw him

make some motion with the rein; just as he moved his hand he looked toward the train; he gave a glance back; the team came right up to the track, seeing which witness jumped down; does not know whether he could have stopped; that would have depended on how hard the team pulled; thinks there was room for him to have stopped; the train would not have hit him had he stopped when witness first saw him; when he glanced back, did not seem alarmed; witness did not give any signal, supposing he would stop; did not suppose he was going to come on to the track.

This testimony is not contradicted, or weakened by any witness, and it encourages the belief, that appellee saw the train which he could not but have heard and seen, almost constantly, in the last twenty rods he traveled, in time to have avoided the accident, had he acted with the usual prudence and circumspection demanded of every man who travels on roads intersected by railroads bearing their ponderous and dangerous machines. *Winship*, the county surveyor, who testified for appellee, says, that a point in the highway one hundred feet west of the crossing, is forty-eight feet from the railroad in a straight line, and that a man standing there could see a point on the track, marked on the plat as W, which is four hundred and fifty feet from the crossing; a man in a wagon could not, at that point, have seen the cars at the whistling post. This post was eight hundred and seventy feet farther west. But no witness has said the noise of the cars driven at a velocity of thirty miles to the hour, could not be distinctly heard the whole distance from the ravine and beyond it, to the crossing, as at no time would the traveler on the highway and the train of cars, be separated a greater distance than about seventy-eight feet, and all the time approaching nearer and nearer to one another, as they were going in the same direction on lines slightly converging.

While then, no witness has said such a train of cars as this, and running at such a high velocity, could not be heard a distance of seventy-six feet, and as the weight of evidence clearly is that for most of the distance from the ravine to the crossing,

the cars could be plainly seen, it would seem to follow, that appellee was unusually negligent in not availing of his sense of sight and hearing, though the bell was not continuously rung, or the whistle sounded, and evinces a want of care on his part, which certainly contributed very essentially to produce the accident. In the case of the *Peoria Bridge Association* v. *Loomis*, 20 Ill. 235, which was a case of injury by a railroad train, this court said, "that the plaintiff saw and heard the locomotive, he had time and opportunity to get down and take his horses by the head, as prudent men do every day when plowing in their fields on the approach of a locomotive. It is required of them, that they shall put themselves to some little trouble to avoid these accidents. Even when the wagon was pushed on to the railing, some of the witnesses say he had time to get out and save himself. He did not attempt to do any thing, but sat in his wagon wrapped in his buffalo skin, whipping his horses, sawing their mouths with the reins and bits, and so carelessly and unskillfully managing them, as to have contributed very materially to produce the disaster."

Now if appellee both saw and heard the train, in time to prevent the collision, it was his duty, while the railroad must be held to the highest degree of care, to have taken some measures of his own volition, to avoid a collision. He had no right to run recklessly into danger. *Marshal* states, when he met appellee, about half-way between the crossing and the ravine, his team was in a walk, and when he, Marshal, got on the bridge over the ravine, he was abreast of the train. *James Karle* testifies for appellants, that they were six or eight rods from the crossing when he first saw the team, and he was then ringing the bell; appellee was sixteen or eighteen rods from the track; the horses continued to trot until they came to the track; the first this witness saw of appellee was his wagon and himself; his horses were then on the trot, and just as the witness looked out of the window, appellee slapped his horses and turned and looked up. From his seat witness could have seen the horses if they had been on the track as far back as the ringing post, say sixty rods; appellee was sitting pretty

near the center of the wagon, a little to the front perhaps, on something higher than the box.

Now it is well known, and needs no proof to establish it, that a team of horses can usually be stopped of a sudden, in a space not exceeding their own length, and had appellee been disposed to use ordinary caution, he could very easily, when ten feet or less from the track, got out of the wagon and secured his horses until the train, then so near, had passed. Is it not quite probable from the testimony, that after meeting Marshal, appellee saw the train, and thought he could, by some extra exertion, make the crossing before the train could reach it, not knowing, or if knowing, not remembering, that a train at thirty miles an hour, was running at a speed ten times as great as his own. Filled with this idea, which many men before him have entertained, he urged on his team by a free use of the reins, and was caught by the train the moment he touched the crossing. There is, certainly, an appearance of great negligence on the part of the appellee, but a majority of the court do not choose to place their decision on this ground, but on the ground of excessive damages.

In cases quite similar to this, very respectable courts have ruled against plaintiffs, manifesting the same degree of negligence, as may be charged. In the case of *Steves* v. *The Oswego and Syracuse R. R. Co.*, 18 N. Y. (Court of Appeals) 422, the only omission on the part of the company, was to ring the bell or sound the whistle as required by law. It was in proof that the plaintiff, by the exercise of the most ordinary care, could have seen and heard the train; that the slightest attention to his own safety was all that was required. With his sense of hearing unobstructed, he might have heard the train long before it approached the crossing, and in abundant season to avoid even the possibility of danger. The court *held*, the plaintiff was not entitled to recover. In a similar case in 21 Barbour, 339, *Sheffield et al.* v. *The Rochester and Syracuse R. R. Co.*, the decision was the same; and so in the case of *Brooks* v. *The Buffalo and Niagara Falls R. R. Co.*, 25 Barb.

600, it was *held*, the plaintiff was not entitled to recover. These cases are all quite like this.

We come now to the consideration of the damages awarded on this evidence. On this point we are all agreed. We are of the opinion, the evidence justifies no such verdict, and at " first blush," it seems outrageously excessive, and the result of passion, and of prejudice, rather than of cool reflection.

This court said, in the case of *Peoria Bridge Association* v. *Loomis, ante,* " where there is an absence of proof of willful negligence in an action to recover for personal injuries, and no foundation for the heavy damages awarded, and the finding of the jury manifests feeling and prejudice, a verdict will be set aside. We also, in that case, reiterated a familiar principle, that in actions for personal injury, juries may give exemplary or punitive damages in cases of willful negligence or malice, but it is requisite such a case must be made. In that case the plaintiff had received serious injuries, his wagon was destroyed, one horse killed and the other crippled, yet, as the evidence showed that the plaintiff was himself in some fault—that negligence could be imputed to him, this court *held,* that the verdict, under the circumstances proved, manifested feeling and prejudice and did not hesitate to set it aside on that ground. So in the case of the *C. B. and Q. R. R. Co.* v. *Parks,* 18 Ill. 460, this court set aside a verdict rendered against the company for $1,000 for putting a passenger off the train at a place other than a regular station, on the ground alone of excessive damages. So in the case of the *Terre Haute, Alton and St. Louis R. R. Co.* v. *Vanatta,* 21 Ill. 188, a verdict of $1,000 for the same cause was deemed excessive, and it was set aside for that reason. The result of the rulings of this court on this question may be summed up as follows: that a verdict, in a case of tort, will not be disturbed unless it seems probable, from the amount of the damages assessed, that the jury acted under the influence of prejudice and passion. *Schlencker* v. *Risley,* 3 Scam. 483; *C. B. and Q. R. R. Co.* v. *Parks,* 18 Ill. 460; *Peoria Bridge Association* v. *Loomis,* 20 id. 235; *Terre Haute, Alton and St. Louis R. R. Co.* v. *Vanatta,* 21 id. 188.

The most that can be urged against the appellants in this case is, that they neglected to comply with two plain and salutary laws, one which required them to ring a bell or sound a whistle for eighty rods, continuously, before reaching a public road crossing, and the other, neglecting to keep up the required warning board. The evidence on this last point was conflicting, several witnesses having sworn that it was not down until after the accident occurred, while others testified it was down, and laid up against the fence at the time of and before the accident. The jury might perhaps, on this point, have found either way. Upon the other point, there was much testimony going to show the bell was rung and the whistle sounded, at intervals at least, from the whistling post west of the Backbone, for some time, and the whistle sounded some rods before the collision took place. But this imperative demand of the law was not fulfilled, and we have felt inclined to hold, in view of the public safety, that the omission shall be deemed great negligence. But on the point of appellee's carelessness, his failure to exert the ordinary caution every careful man is bound to exert, to save himself from injury, presents a circumstance well calculated to weaken the claim of appellee to exemplary or vindictive damages. We cannot shut our eyes to the fact, that for several rods before appellee reached the crossing, this train was in sight and hearing, running on a plane elevated from three to five feet above that on which he was moving, and not eighty feet from him, for a considerable distance. We cannot but think, appellee could have prevented the sad disaster, had he been ordinarily circumspect and cautious, and had done what many farmers do every day, secure the horses they are using on the approach of a locomotive. Good policy, as well as the safety of all, requires that all reasonable means shall be used to prevent the occurrence of such accidents, and while railroad companies must be held to strict accountability, individuals must be required to do their whole duty. We hold, it is the imperative duty of persons traveling on a public road, crossed by a railroad on the same level, to use all the faculties they have, on approaching the crossing, to discover a train, not

only by listening for bell or whistle, but to look out by all means, whether there be a warning board or not to enjoin that duty upon them. They must use all reasonable means in their power to prevent accident, for an accident to them may be the death of many innocent persons on the train, who can have no agency in producing or in preventing an accident.

It surely cannot be claimed that those in charge of this train intended to injure appellee. Is it not more reasonable to believe appellee thought he could make the crossing before the train reached it? Does not the uncontradicted testimony of Karle go far to show this? If so, then the case is disrobed of its worst feature, and a different measure of damages should have been resorted to by the jury. A leaning in favor of an injured party, in all breasts, is neither unnatural nor unexpected, but it may be carried to such an extent as to do great injustice. Railroad companies everywhere, in every country where they exist, are compelled to employ such men to manage their trains as they can get; they must take men as they are, and when providing the best men that can be had, it would seem unreasonable to punish them immoderately for a neglect, on the part of their employees, of a statutory duty, even if it could be safely affirmed the accident was wholly occasioned by this neglect, which cannot be in this case. These roads are a public necessity, and have advanced this country full fifty years in the path of progress, and however much we may be disposed to find fault, and justly, too, with the management of many of them, still, we must not forget that many of the accidents for which they are made to pay heavy damages, may have been occasioned by the negligence, in whole or in part, of the party complaining. Cases are rare, if they exist at all, where an engine and a train of cars have been destroyed by the negligence of an individual whose stock, running upon the road, has caused the accident, that the railroad company has recovered damages for the injury, while cases are abundant that individual complaints of injuries by them are listened to with attentive ear, and seldom, if ever, go unredressed. This is inseparable from the nature of man, and furnishes no reason

why those companies should not respond fully in every case properly made out against them.

Descending to particulars, in this case it was proved that appellee's horses were both killed, and they were worth three hundred or three hundred and twenty dollars. His wagon, which was an old one, had one wheel destroyed and axle broken, and the bed or box slightly injured, and one of the springs of the seat broken. It was worth seventy-five or eighty-five dollars, and was deteriorated half its original value by the injury. The harness was injured to the extent of twenty-five dollars. Expenses for medical attendance. were, as proved, one hundred and thirty-eight dollars and fifty cents, and for nursing, at three dollars per day, twenty-six days, seventy-eight dollars, making in all six hundred and one dollars and fifty cents, as follows: For property destroyed or injured, three hundred and eighty-five dollars; for surgical attendance, one hundred and thirty-eight dollars and fifty cents; for nursing, seventy-eight dollars. The verdict was for five thousand eight hundred and seventy-five dollars, leaving as *solatium*, for pain and suffering and loss of time, and the permanent injury of appellee, the sum of five thousand two hundred and seventy-three dollars and fifty cents!

In the case of *Parks*, 18 Ill. 460, before cited, which was a verdict for one thousand dollars for putting the plaintiff off the train at a place not the regular station, this court said: "For putting the plaintiff off the train, at a place not allowed by law, a technical wrong was done him, for which he had, undoubtedly, a right to bring this action, and to recover such damages as he sustained for the wrong done him. The jury allowed him one thousand dollars for those damages. We cannot hesitate to say that the damages allowed are grossly, not to say outrageously, excessive, although, in a case of this kind, this court will interfere with a verdict with great reluctance, yet we will not hesitate to do so, when it is apparent, at first blush, that the jury have misapprehended the law of the case, or misunderstood the facts, or else have been influenced by their passions or their prejudices rather than by the

law and the facts." Again, the court say: "In view of all these circumstances, can any impartial and unprejudiced mind for a moment tolerate the supposition that the plaintiff was entitled to one thousand dollars damages, when by his own wrongful act he had subjected himself to the liability of being expelled from the cars rather than allow a friend to pay it for him which it was his duty to have paid, and the only real ground of complaint which he has is, that he was put off a short distance from the depot, instead of at the depot? The very statement of the proposition is startling, and carries conviction to the mind at once, that the jury were led to find their verdict, not from the facts alone, and the law as applicable to those facts." Again the court say: "This verdict cannot on principle be sustained. To uphold it, would not only be doing a great wrong to the defendant in this particular case, but as a precedent would be doing an infinitely greater wrong to the community who might suffer by it. This judgment must be reversed and the cause remanded, upon the ground alone that the damages are excessive."

The tort in this case was of a character entirely different from the one now under consideration, and we quote from it merely as authority to show what an appellate court will do, on the question of excessive damages — that judgments will be reversed on that ground alone whenever it shall be made to appear the jury may have been under improper influences.

In *Loomis'* case, 20 Ill. 235, which was a case not unlike this, this court said: "The rule of damages, for personal injury inflicted by negligence, is loss of time during the cure, and expense incurred in respect of it, the pain and suffering undergone by the plaintiff, and any permanent injury, especially when it causes a disability from future exertion, and consequent pecuniary loss."

In *Hazzard's* case, 26 Ill. 373, on the point of excessive damages for a personal injury by a railroad train, this court said, "that the amount of damages depends upon the nature, extent and permanency of the injury; the effect it has produced, and is likely to produce upon the physical condition of

the plaintiff; his pain and suffering both mental and physical, past and future; the effect it has upon his pecuniary interests, both as regards the expense occasioned by the injury, and the effect it has upon his business."

The injured party in that case was a practicing lawyer in high standing, and the injury was a displacement of the ankle-bone. This, the court said, though painful enough, is nothing to the loss of the foot, the hand, eye, arm, or any other prominent limb, but no loss of his practice was shown as a consequence of the injury, nor was he disabled from pursuing his profession with the same ardor, and the same efficiency, and with the same profitable results as theretofore. And we further said, the true view to take of the amount of the damages in this regard, is, "how much are his professional receipts diminished or likely to be diminished by the accident? Should a person whose avocations in life are not professional, but dependent for success on the free use of all his limbs, be injured, the proper inquiry in such case would be, to what extent is he disabled? If a carpenter, blacksmith, or other person whose living is obtained by manual labor, should be crippled in his hand in so far that it detracts from his power of earning his accustomed livelihood, so far should the jury give him damages over and above the usual damages for the pain and suffering, medical attendance, loss of business while confined, etc.; so with every other profession" or pursuit. We further said, "for pain and suffering, the jury would have a right to be liberal in a proper case, and there is no fixed rule by which, in this estimate, they are to be governed, keeping in mind all the time, that though they may give damages, they must not be so great as to carry with them the appearance of being the progeny of prejudice, passion, or other unworthy motive."

Allowing, then, great but reasonable latitude to the jury, not only to compensate the injured, but to punish the transgressors of a wholesome public law, we cannot see how this verdict can be retained. Admitting the negligence of the appellants exceeds that of appellee, the injury to appellee is not, by any means, great in degree. It is not like the loss of a leg, an arm, or a

foot even, for, without the toes of one foot, a man is by no means incapacitated to earn a good living by manual labor, notwithstanding what Doctor Lattimer said. Had appellee lost the fingers of his left hand, then, indeed, might it be said he was unfitted for manual labor, but, while he has his hands, it cannot be truly said he cannot earn his living by manual labor. What were the pursuits of appellee? What was his business at the time of the accident? It is said he was a farmer, but, as no one said he owned land, we infer he was a renter, and it was proved he was worth from one to two thousand dollars, and kept a "stable horse," and moved about with him. The inference is that this horse and team were the bulk of his property. Now, it is very apparent that the last named branch of business can be quite well performed by a man who has been deprived of the toes of one foot, and, as several witnesses stated, with our improved agricultural machines, he can still do much farm work, and it is absurd to say, as Dr. Lattimer testified, if appellee came to him for a pension, knowing what he does of his foot, he would state he was wholly disabled from getting a support by manual labor. At the same time he says there are many things he could do, but not those which required much walking. The inference is he could do things which required some walking, and could do any amount of riding if ulceration of the toe did not arise; but the danger of that, he says, is not very great. His judgment is that the toe will heal, but will be apt to break out again. *Dr. Dunn* thinks the injury disables him two-thirds as a farmer, but, if he should learn a trade that would not require walking, perhaps it would not disable him to any great extent. If he should walk moderately, and adapt himself to some sedentary pursuit, there would be liability of ulceration, but the liability would not be very great.

We are inclined to the opinion, from the testimony of Dr. Holton, who attended appellee after the amputation, that bad surgery may have had not a little to do with his present unfortunate condition. He says, with all tenderness and respect for the amputating surgeon, that from the ulceration and condition

16—40TH ILL.

there had been a great deal more sloughing of the soft parts than had been anticipated by that operator. The metatarsal bone of the great toe was naked, so far as the flesh was concerned. He does not think his foot will heal unless some surgical attention is given to it. If it was amputated at the head of the metatarsal bone, it would be more likely to heal. This surgeon further says, if the operation he has indicated should be performed, he thinks his foot would heal up. It would not impair its muscular action. If it should heal up, he could superintend farming as well as ever, and plow and plant corn and rake hay as they do now-a-days, by riding, and he could haul grain. And he certainly could saw and cut and split wood, feed cattle, attend to his stallion, and do many useful things about a farm, all which show he is neither two-thirds disabled, nor any thing like it.

The government of the United States, lauded everywhere as a just and generous government, and by no means afraid to disburse the public money freely, gives to its mutilated soldiers, to those who have lost in battle, arms, legs, or other useful member, about three hundred dollars a year, without regard to their occupation, and in the worst cases of disability. This verdict gives appellee a small fortune, the interest on which, at legal rates, would amount to near six hundred dollars a year, and he, at the same time, able to attend to almost all kinds of ordinary business. What justice is there in it?

The legislature of this State have declared, if, in a case like this, death shall ensue, the utmost limit of recovery recoverable by the next of kin, made a widow or orphans by the accident, shall be five thousand dollars. These damages are given as compensation for the actual loss of one whose labor contributed to the stay and support of his widow and next of kin. No part of it is given as solace. What, then, must be thought of a verdict giving to a man who is not permanently injured, and who, in the opinion of Dr. Holton, if proper surgical treatment is afforded him, will not be seriously disabled? To what else but to passion and prejudice could the verdict be attributed?

In *Parks'* case, this court said, " It is not the duty of courts

to enforce the arbitrary edicts of juries; but it is their duty to stand firmly and fearlessly between the party and the jury whenever it is manifest that the party has been made a victim to their prejudices. In this class of cases, great latitude should, no doubt, be allowed to juries in their estimate of damages, but to this there must be a limit; and, should we refuse to interfere in this case, it would be equivalent to saying to juries in all cases of this kind, we will shut our eyes to the facts of the case, and let you work your will with all parties placed in your hands. Now, do with them as you please, we will not interfere."

We accord fully in these sentiments and reiterate them, and with the most anxious desire that the appellee shall receive just compensation for the injury he has sustained, we must say the damages awarded are out of all character as compared with the injury done, and we cannot sanction it. At first blush, it seems to be the result of passion and prejudice, and not of cool determination, and it must be set aside.

This is not a case of a mere assessment of damages upon an undisputed state of facts, but it is a case where different men might very honestly draw different inferences from the evidence. There is, as we repeat, much ground for believing that the law was complied with by appellants, and still stronger ground for the belief that appellee both saw and heard the train before he reached the crossing, which considerations should have had their proper influence in estimating the damages. No malice was shown or pretended, or intentional wrong. In a case between individuals, where one wantonly and maliciously makes an assault upon another, and cuts off the toes of his adversary's foot, but not designedly, while the law would hold him liable for the whole injury consequent upon his unlawful act, no jury could be found who would coolly, and, uninfluenced by passion or prejudice, give, against the wrong-doer, such a verdict as this. We admit, the case of a railroad train running regardless of law, demands, at the hands of a jury, something more in the way of damages, than a mere individual, and this for the protection of the public; yet, while admitting this, we cannot perceive any thing in this case that should call down

the vengeful power of a jury against a party, whose omission of duty was at least questionable, and in favor of one whose own negligence is pretty clearly established. We think justice requires the case should undergo revision by another jury.

The case of *C. B. and Q. R. R. Co.* v. *Triplet*, 38 Ill. 482, has been commented upon. We desire to recall nothing said in that opinion. This case differs essentially from that, in the amount of negligence shown by the company, in the fact that the person killed was partially deaf, was riding in a covered buggy, and had to pass through a cut which concealed the coming train, and the train itself made up of platform cars driven in front of the engine. And in this case, grievous and fatal as the accident was, the jury allowed but one thousand dollars damages. We admit most fully, that every traveler on a highway, crossed by a railroad, is entitled to the benefit of the signal required by the statute, but at the same time, we cannot say, that a party who could both see and hear the train in time to avoid it, and did not use the proper means, or any means, to avoid it, should have vindictive damages.

The judgment, for the reasons given, must be reversed, and the cause remanded that a new trial may be had.

Mr. Chief Justice Walker, and Mr. Justice Lawrence:

We concur in reversing the judgment in this case, on the ground that the damages are excessive. We think justice requires the case to be submitted to another jury. As to the relative negligence of the parties we express no opinion, further than to say, that this question was fairly submitted to the jury by the instructions, and if the verdict had been for a reasonable sum, we should probably not have been inclined to disturb it.

*Judgment reversed.*