Wright, J.
We do not feel authorized to disturb this verdict, on the hypothesis that the railroad company is without negligence in not giving proper signals. Upon this point the evidence is conflicting. Several of the railroad employes testify that the bell was rung while approaching the crossing. Three persons were on the engine —the engineer, fireman, and Ologg, the wreckmaster. Each had a hand in ringing the bell between Anderson’s and Leach’s crossing. Opposed to this is the testimony of various witnesses, with different opportunities of observation, who declared they heard no bell, and some of whom assert that had it been rung they would most probably have heard it. Be it as it may as to the bell, it quite clearly appears that the whistle was not sounded.
Whether or not the railroad company were bound to whistle at every road crossing, is a proposition we are not prepared to affirm, as at present advised. The use of the *350 whistle should be reserved for a special signal of danger. If it is constantly employed, familiarity with it destroys all its salutary effects, and it moreover becomes an intolerable nuisance. A report of the railroad commissioners of Massachusetts may be found in Wharton on Negligence, 804, which discusses this subject intelligently. And we do not say that the omission to whistle upon this particular occasion was negligence. This is a question to be decided upon the special circumstances of each case as it arises. The statute now in force, passed after this accident occurred (69 Ohio L. 49), requires this duty at the hands of the company. But if it be assumed, upon the finding of the jury, that the railroad company were guilty of negligence in not giving proper signals, it i^ to be considered what effect such negligence has upon the rights of the parties.
In the case of Wilcox v. Rome, Watertown and Og. R. R., 39 N. Y. 358, the proper signals by bell or whistle were not given, but plaintiff was not allowed to recover because of his own negligence. The court say (p. 365): “ The omission of the company to ring the bell or sound the whistle near the crossing of a highway does not relieve the person who is about to pass over the highway from the obligation of employing his sense of hearing and seeing to ascertain whether a train is approaching.” And the court proceeds to observe that deceased could have seen the train had he looked for that purpose; but he neglected to exercise that prudence which the circumstances demanded, and such carelessness is not excused by the fact that the other party has failed to give the accustomed signals.
In the Chicago and Minn. R. R. v. Dill, 22 Ill. 271, it is said that the omission to ring the bell or sound the whistle, although that duty is imposed by statute, is not negligence, unless such omission produces the injury complained of. The result may have been the same if the bell had been rung or the whistle sounded, and if so, it was not negligence to omit such signals. See also Stevens v. Oswego and Syracuse R. R., 18 N. Y. 422.
*351 The case of Artz v. Chicago, Rock Island & P. R. R., 34 Iowa, 154, is an interesting case upon this subject. In that state there is no statute requiring the bell to be rung or whistle blown. As to such statutes, the court say, even where they are in force, the omission to comply with them does not make the railroad company absolutely liable for an injury, but only when such injury was occasioned without contributory negligence upon the part of the person injured. In that case, as in this, the court say, that as to the giving the signals by bell or whistle, the evidence was conflicting}, and the verdict could not be disturbed on that ground. The evidence, however, showed that for a distance of at least 660 feet before reaching the crossing, plaintiff could have an unobstructed view of the track, and trains for at least 1,010 feet; that the distance of view increased as the crossing was approached ; that plaintiff was familiar with the locality, the train was on time, and the headlight burning, it being about nine o’clock in the evening. And the court say : “ This being true, we hold, as a matter of law, that the plaintiff can not recover, since his own negligence must have directly contributed to the injury.”
The court also make the following very pungent observations :
“ But it is urged by the appellee’s counsel that the plaintiff testifies that he did both look and listen to see and hear the train, but did not, and that this testimony shows that he was not guilty of contributory negligence, or, at the very least, it made it a question of fact for the jury. The difficulty, however, with the position is, that the conceded or undisputed facts being true, this testimony cannot, in the very nature of things, be also true. It constitutes, therefore, no conflict. Suppose the fact is conceded that the sun was shining bright and clear at a specified time, and a witness, having good eyes, should testify that at the time he looked and did not see it shine, could this testimony be true ? The witness may have' been told that it was necessary to prove in the case that he did look and did not see the sun shine; he may have thought of it with *352 a desire that it should have been so; he may have made himself first believe it was so, and this belief may have ripened into a conviction of its verity, and possibly be even may testify to it in the self-consciousness of integrity; but after all, in the very nature of things, it can not be true, and hence can not, in the law,,form any basis for a conflict upon which to rest a verdict. A man may possibly think he sees an object which has no existence in fact, but which it may be difficult, if not impossible, to prove did not exist or was not seen. But an object and power of sight being conceded, the one may not negative the other;
“ In this case the plaintiff had good eyes; the train was approaching him in the night, with the engine’s headlight burning brightly; if the plaintiff looked he must have seen it, or he must have looked very negligently and carelessly. In either case, he was necessarily, in the eyes of the law, guilty of contributory negligence, precluding his right to recover.” Spencer v. Ill. Cent. R. R., 29 Iowa, 55; Chicago & R. I. R. R. v. McKean, 40 Ill. 218.
The cases on this subject of negligence are numerous, and could not all be commented upon in an opinion of any reasonable length. The principle we deduce from the authorities is, that an omission to give the ordinary signals by. bell or whistle does not absolve the plaintiff from the necessity of exercising ordinary care.
Manifestly a plaintiff can not, with his eyes open, drive squarely into a train, which he sees and knows is before him, and then claim to recover because the bell was not rung nor the whistle sounded. Equally true is it, that if he could have seen the train, and could have avoided it by the exercise of ordinary care, he can not recover. And if the circumstances were such that he could have known and ought to have known, the accident must be chargeable to his own fault. And we hold the rule to be that if, by the exercise of ordinary care, the plaintiff could have seen and avoided the train, the omission to whistle or ring, alone, is not such negligence on the part of the company as will justify a recovery. The court, therefore, very properly *353 told the jury: “ To entitle the plaintiff to recover, he must establish two propositions — first, that such injury was caused by the negligence of the company, and secondly, that his own negligence did not contribute to his injury.”
And again : “If you shall find that the company, by its employes running said train, failed to exercise such reasonable care as men of common prudence and caution, situated as they were, having charge of, or' being engaged in, the same business, would have exercised, and such failure caused the injury of the plaintiff, the defendant is liable, unless the plaintiff’s own negligence contributed to the injury ; in which case he would not be entitled to recover, whether the defendant was guilty of negligence or not. Negligence of the plaintiff', directly contributing to his injury, defeats a recovery. The law does not apportion the damages between parties whose joint negligence caused to one of them an injury. Nor does it permit the plaintiff.in such caseto recover, although he was less negligent or’careless than the defendant. If the injury was the work of the co-operating or concurring negligence of both parties, the law permits no recovery.”
It is therefore necessary to inquire whether'defendant in error was himself guilty of such negligence as will preclude a recovery.
It is well said in Wharton on Negligence, section 382: “ It is the duty of a person who attempts to cross a railroad to listen for signals, to notice all signs that may be put up as warnings, and to look up and down the road. It follows, therefore, that if a traveler by looking along the road could have seen an approaching train in time to escape, it will be presumed, in ease of collision, that he did not look, or looking did not heed what he saw, and in such case the road under ordinary circumstances is not liable.”
The same author (p. 384) says: “ Where a person, knowingly about to cross a railroad track may have an unobstructed view of the railroad so as to know of the approach of a train a sufficient time to clearly avoid any in *354 jury from it, he can not, as a matter of law, recover, although the railroad company may have been also negligent or have neglected to perform a statutory requirement.”
Authorities cited in the briefs of counsel abundantly sustain the principle thus laid down.
The evidence is clear that at the summit in front of Fisher’s house, where Elliott alleges he stopped to look, a train can be seen for a long distance east of Anderson’s crossing. Some witnesses say half a mile, some a mile. At Anderson’s crossing it is out of sight for a few rods, though the smoke and steam may still be seen. From Anderson’s crossing the greater part of the way to Leach’s, the train is in plain sight, until just as it reaches the latter, where the top of the smoke-stack is visible.
The best estimate that can be formed from the evidence is, that the train was moving thirty miles an hour, and Elliott says he started from the summit 'at a good trot, probably nine or ten miles an hour. It was one hundred .•and ninety-eight feet from summit to track, and Elliott ■would pass over this distance, at ten miles an hour, in .¡about thirteen seconds of time. While he was passing -over this distance the train would travel about eight hundred feet, which was about half way to Anderson’s crossing. When, therefore, he stood at the summit and looked, the "train was somewhere between Anderson’s and Leach’s, ¡and somewhere about eight hundred feet, or between five ‘hundred and one thousand from the latter. It was, therefore, upon that part of the track where it was plainly to be ¡■seen, as some say, down to the sills of the cars, others say to the driving-wheels.
If, therefore, Elliott, at the point of observation, had' looked as a man exercising ordinary care should have .looked, he could not have failed to see the train. He would have seen it at such a distance advancing at such a •speed as would have satisfied auy prudent man that an attempt to cross would be at the risk of his life, just as the «event proved.
*355 It is nothing to the purpose that he should say he looked this way and that, when the object he seeks to discover is plainly and palpably before him, and he fails to see it. Either his statement is not true, or his exercise of vision was such as to be not only negligent but culpable.
In descending the hill from the summit to the track, one witness says there is no point at'which a train from the northeast may not be seen all the way from Anderson’s to Leach’s. This witness is Braman, who assisted the county surveyor in making a survey of the localities, and who says he took his observations in a wagon. Other witnesses say there is a point, going down, where the hill shuts out the train for a short distance. But it does not appear that these witnesses observed from a wagon or carriage, the elevation of which, of course, would give a wider view.
Be this as it may, it is entirely clear that a traveler going down this hill reaches a point, before getting to the track, where the train again is in view. . This point is thus located by the witnesses :
One says: “ When you get down to within about sixty feet of the track, you can look up the track and see a train approaching at Anderson’s crossing.”
Another thus : “After you commence descending the hill you can not see train until you get to within sixty-seven feet of the track at the crossing — there you can look up the track two hundred and forty-seven feet and see the top of' smoke-stack ; at the point fifty-seven feet from track you can look up the track to Anderson’s crossing.”
Another: “At that point (sixty-seven feet from track), could see engine up the track two hundred and forty-seven feet; going six feet nearer the track could look up the track to Anderson’s crossing, and by going a step farther could look up the track a mile or more.”
' Another: “When got to the point, sixty-six feet from the track, could look up the track, inside the bank, to Anderson’s crossing, ninety-seven rods; when got within five or six feet nearer the track could look way beyond Ander *356 son’s crossing; made repeated and careful observation of the train going through the cut at different times.”
These are all witnesses for the plaintiff, below, Elliott.
Witnesses for the railroad speak thus:
Swift, the surveyor, who made the measurement, says he made repeated experiments with the engine Maryland, which occasioned the accident. He says that at a point one chain ninety links, or one hundred and twenty-five feet, one can see -all the way through the cut. Sixty-six feet from the crossing can see up to Anderson’s; and sixty feet from the crossing can see up the track for a mile.
A. Jones says that at sixty-six feet from track one can see up to Anderson’s.
Robert Blee, division superintendent, states he made experiments with engine Maryland, and at sixty-six feet from Leach’s crossing a train can be seen at Anderson’s.
It is, therefore, perfectly clear that at a point somewhere about sixty feet from the track, the train' can be seen at a considerable distance. Had Elliott approached the track at this point, which he alleges to have been a “ highly dangerous ” one, slowly and cautiously, as a prudent man would have done, had he been walking his horses, as it would have been entirely safe to do, if he was not absolutely certain there was no train in the vicinity, within the space of sixty feet, he might have seen and avoided the danger. Ordinary care would have demanded such degree of caution, from the fact that the train was approaching diagonally behind him. Rut it appears he drove down the hill on a trot, upon the track. He also states that after leaving the summit he did not look or listen for an approaching train until he got on the track, and he first saw the train when he was on the track.
A lai’ge amount of learning is developed in the books, upon the subject of the various degrees of care and their corresponding phases of negligence. It may perhaps be doubted whether the elaborate attempts to define the exact distinctions between the adjectives slight, ordinary, and *357 gross does not tend, not only to mislead juries, but sometimes to result even in judicial confusion.
When it is announced that “ slight negligence is the want of great care,” and gross negligence is the want even of slight care” (Shearman & Redfield on Negligence, sec. 18), the statement imparts a perfectly correct notion of the essentials of negligence, provided it is first accurately understood what its reverse is. There is pertinency in the remark of Baron Rolfe (Wilson v. Britt, 11 M. & W. 113, and Willes in L. R., 1 C. P. 640), that gross negligence is merely negligence with, the addition of a vituperative epithet. When it is said that a person must exercise ordinary care, the statement is so plain in its language and so simple in the idea to be conveyed, that if the proposition is not comprehended in this form, mere words will probably occasion less intelligence.
If an individual, with a fair opportunity to see and heart a railroad train for a mile or more before reaching the track, so conducts himself as to drive straight into a collision, he does not act with ordinary care, and assists at least in bringing about the accident.
A majority of the court are therefore of the opinion that the undisputed facts show that the defendant in error was chargeable with contributory negligence; that he did not exercise that degree of care which one of ordinary prudence should have done, and that the gravity of his disaster does not furnish sufficient ground for his recovery.
The court erred in refusing to set aside the verdict and grant a new trial, and the judgment will be reversed.

Judgment accordingly.